INTERSTATE INDUSTRIAL UNIFORM
RENTAL SERVICE, INC.

v.

COURI PONTIAC, INC.

Supreme Judicial Court of Maine.

April 16, 1976.

914

Richard A. Davis, Portland, for plaintiff.

Perkins, Thompson, Hinckley, Thaxter & Keddy, by Owen W. Wells, Thomas Schulten, Portland, for defendant.

Before DUFRESNE, C. J., and WEATHERBEE, POMEROY, WERNICK and ARCHIBALD, JJ.

WEATHERBEE, Justice.

This is an action for the alleged breach of an express written contract dated March 12, 1970 between the plaintiff and defendant in which plaintiff agreed to provide and service for the term of two years a designated number of rental uniforms and accessories for defendant's personnel. The contract provided for liquidated damages in the event of defendant's default, such damages to be measured by one-half the weekly rental service charge for the remaining life of the contract, together with any loss charge and reasonable attorney's fees incurred by the plaintiff in enforcing its rights. Plaintiff brought this action in the Superior Court for Cumberland County to enforce this liquidated damages clause.

The defendant, Couri Pontiac, Inc., was acquired in early 1970 by Harold Wiley, who had for many years been a business acquaintance of John McIntosh, a salesman for plaintiff Interstate Industrial Uniform Rental Service, Inc. Largely because of this previous relationship, the parties, through their respective agents, executed the Uniform Rental Agreement, breach of which the plaintiff now alleges. The plaintiff's salesman, John McIntosh, testified that before the agreement was executed defendant's secretary made a "rough" check to determine whether defendant had any uniform rental agreement with another uniform company. Although the check revealed nothing, Couri was, in fact, under written contract to Standard Uniform Rental Service, Inc. for the same service

on a year to year basis unless terminated by written notice 30 days prior to the contract anniversary. At the time the contract with Interstate was executed, neither party knew of this written contract, although both were aware that Standard was then servicing Couri.

Plaintiff procured and tailored the uniforms which were installed in the defendant's place of business during the first week of April 1970. Both parties performed pursuant to the agreement for approximately five weeks. Mr. Wiley then discovered that Couri was under contract with Standard for the same type of service. In an effort to resolve the problem, he telephoned Mr. McIntosh and asked him if there was anything he, on behalf of Interstate, could do to solve the problem. Neither party disputes that plaintiff then agreed to withdraw its uniforms.

The parties do, however, disagree about the understanding accompanying the withdrawal of the uniforms. Mr. McIntosh testified that the uniforms were withdrawn as an accommodation to Wiley and that he and Wiley agreed to resume uniform service on October 18, 1970 at which time the contract with Standard was to expire upon seasonable notice. Defendant denies that there was any agreement that Interstate would resume its service after this brief suspension.

In October, plaintiff contacted Mr. Wiley about resumption of uniform services under the contract and was informed by Wiley that the status of the contract was uncertain because he had failed to cancel seasonably the contract with Standard. Mr. Wiley had, on October 16, some 28 days too late, notified Standard that he was cancelling service with them because he had a contract with the plaintiff. Because that letter was not timely, the contract between Standard and defendant was automatically renewed. Finding that he had two different contracts for the same service, Mr. Wiley announced that he would do

business with the company that agreed to indemnify him in the event of a law suit by the other. Standard agreed to do so. Plaintiff refused and brought this suit for breach of the contract.

After trial, the justice below concluded that the contract resulted from the parties' antecedent mutual mistake under which both believed that the relationship between Standard and the defendant could be terminated at will and the business immediately transferred to the plaintiff. This mutual mistake, he ruled, prevented the formation of a legally binding contract. The justice further found that the plaintiff had lulled the defendant into a false sense of security regarding the suspension of services and had thereby waived its right to liquidated damages. Finally, the Court determined even if no waiver occurred, the plaintiff could not recover under the liquidated damages clause because the damages stipulated were penal, bearing no relation to any actual damages arising from a possible breach. Plaintiff now appeals these rulings. We sustain the appeal.

## I. *Mutual Mistake*

■ Both parties remind us that this Court's review of the record is governed by M.R.C.P., Rule 52(a) which requires that

". . . [f]indings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses."

The burden is on the appealing party to prove clear error in the proceedings below. *Flagg v. Davis*, 147 Me. 71, 83 A.2d 319 (1951). From the evidence before him, the presiding Justice concluded that as a result of their mutual antecedent mistake, the parties had no legally binding contract. The presiding Justice based this determination upon the testimony of the plaintiff's general manager that the plaintiff would not, as a matter of company policy, have

solicited the defendant's business had the plaintiff been aware of the written contract between Standard and defendant.

■ We do not doubt that the presiding Justice could reasonably have concluded that both plaintiff and defendant mistaken-ly believed defendant had no written contract with Standard or that had plaintiff been aware of that contract, it would never have signed the agreement now in dispute. These are the Justice's findings of fact; that is, they represent his conclusion that these phenomena occurred, but without any assertion as to their legal effect. We accept them. The proper question on this appeal, however, is not whether the justice erred in concluding that both parties labored under a mistaken belief of fact, but whether the Justice was correct in concluding that that particular mistake partakes of a sufficient number of the elements constituting the legal standard or formula of mutual mistake to permit one party to avoid the contract. The disputed conclusion is not one of fact, then, but one of law, occasioned by the application of a judicially developed standard or principle to certain facts.

■ This Court will hold open to corrective judicial review conclusions resulting from the application of a general legal principle to the facts of a particular case. *E.g., Frost v. Chaplin Motor Co.,* 138 Me. 274, 25 A.2d 225 (1942) (whether possession of a certain automobile constituted a bailment); *Murray's Case,* 130 Me. 181, 154 A. 352 (1931) (whether petitioner was an independent contractor or an employee within the meaning of the Workmen's Compensation Act). Where the facts are already determined, an appellate court may draw its own legal inference from the record and substitute its judgment thereon for that of the trial court. *Belanger v. Belanger,* Me., 240 A.2d 743 (1968); *Springfield Nat'l Bank v. Couse,* 288 Mass. 262, 192 N.E. 529 (1934); *Ste-*

vens v. Cross Abbott Co., 129 Vt. 538, 283 A.2d 249 (1971).

■ The principle that a contract is not legally binding if both parties have entered into it under an actual and good-faith mutual misunderstanding is well-established in this jurisdiction. *Blue Rock Industries v. Raymond International, Inc.,* Me., 325 A.2d 66 (1974). A mistake of fact occurs if the parties entertain a conception of the facts which differs from the facts as they really exist. Ibid. The mistake must be mutual, that is, the minds of the parties must fall prey to the same misconception with respect to the bargain. *Buol Machine Co. v. Buckens,* 146 Conn. 639, 153 A.2d 826 (1959); *Ward v. Lyman,* 108 Vt. 464, 188 A. 892 (1937). For example, a mistaken assumption about the subject matter of the bargain by one party and ignorance of that mistake by the other party is not a mutual mistake, but two unilateral mistakes; the initial mistake by the first party and a mistake as to the first party's mental state by the second party.

■ We need not decide whether the present case presents a true mutual mistake or merely two unilateral mistakes; for even if the mistake was mutual to both the plaintiff and defendant, it was not sufficiently material to justify rescission of the contract. The doctrine of mutual mistake requires that the mistake touch the subject matter of the bargain and not merely be collateral to it. *Bellwood Discount Corp. v. Empire Steel Building Co.,* 175 Cal. App.2d 432, 346 P.2d 467 (1959); *Petrey v. John F. Buckner & Sons,* 280 S.W.2d 641 (Tex.1955). Only if the mutual mistake relates to a material fact of the essence of the bargain can the injured party avoid the contract. *Vrabel v. Scholler,* 369 Pa. 235, 85 A.2d 858 (1952). Because the materiality of the mistake depends upon

the circumstances of each case, this requirement is necessarily imprecise and is better understood by illustration than through mere recitation. For example, a contract to sell land, "275 acres more or less", will not be enforced where, unknown to the parties, the parcel of land in question was less than 200 acres, *Enequist v. Bemis,* 115 Vt. 209, 55 Vt. 617 (1947), nor will a sales agreement requiring the transfer of good and marketable title to land be enforced where neither party knew of a third party's option on the land. *MacGowen v. Gaines,* 127 Vt. 477, 253 A. 2d 121 (1969). In other words, the mutual mistake must so vitally affect the facts upon the basis of which the bargain was struck that the written contract does not express the intent of the parties. The parties must have, in fact, agreed to something other than that established by the writing. *Greenwich Contracting Co. v. Bonwit Const. Co.,* 156 Conn. 163, 239 A.2d 519 (1968).

In the present case we believe that if any mutual mistake occurred, it related solely to a collateral issue involving the propriety of wisdom of entering into the contract and does not, therefore, render the contract unenforceable. The basic subject matter of the contract between the plaintiff and defendant is unaffected by their misconceptions although the defendant, had he been aware of the true facts, would doubtlessly have perceived the need for the contract differently. The defendant could legally have executed a score of agreements with different uniform rental companies and each contract would express the correct respective intents of the parties to supply and receive rented uniforms. The contract adequately expresses the bargain agreed to by both parties and we believe that the Justice below erred in rescinding the contract.[1]

---

1. Because we conclude that no mutual mistake, as that term is legally understood, occurred, we do not have to consider the issue of whether the defendant's behavior after he became aware of the mistake effectively waived that objection. *See Security Underground Storage, Inc. v. Anderson,* 347 F.2d 964 (10th Cir. 1965).

## II. Plaintiff's Waiver of its Right to Liquidated Damages

■ The presiding Justice concluded that:

"It seems clear that had Interstate made its position definite with respect to the 'liquidated damage' claim that Couri would have protected itself with Standard by seasonable cancellation notice. Instead its agent Mr. McIntosh lulled Couri into a false sense of security by his assurance to Mr. Wiley 'not to worry,' etc.

Under these circumstances Interstate waived and is now estopped to assert its demand for the *liquidated damages* provided in the contract of March 12, 1970."

This Court has previously determined that waiver is a matter of fact. *Colbath v. Stebbins Lumber Co.*, 127 Me. 406, 144 A. 1 (1929). Reviewing the record under the "clearly erroneous" rule described above and mindful of the Justice's opportunity to assess the credibility of witnesses, we must nevertheless conclude that the only finding reasonably to be drawn from the record is that the plaintiff's conduct did not constitute and was not intended to constitute a permanent waiver of its right to liquidated damages under the contract.

■ A waiver is a voluntary or intentional relinquishment of a known right (*Colbath v. Stebbins Lumber Co.*, supra; *Burnham v. Austin*, 105 Me. 196, 73 A. 1089 (1909)) and may be inferred from the acts of the waiving party. *Stewart v. Leonard*, 103 Me. 128, 68 A. 638 (1907). Thus, if one in knowing possession of a right does something inconsistent with the right or of his intention to rely upon it, he is deemed to have waived that right and is estopped from asserting that right if renunciation of the waiver would prejudice the party who has relied upon it. *Smith v. Phillips Nat'l Bank*, 114 Me. 297, 96 A. 217 (1915). To bar enforcement of a known contractual right, the waiver, however established, must have induced a belief in the party who is claiming reliance on that waiver that the waiving party intended voluntarily to relinquish his rights. *Colbath v. Stebbins Lumber Co.*, supra. In determining the question of waiver, the Court must therefore look not only to the conduct of Interstate but also to the effect of those acts on Couri who now claims it was thereby lulled into a false security.

■ The record shows conclusively that the plaintiff not only had no intention to abandon its rights under the agreement and suspended service until October, 1970 only as an accommodation to the defendant, but that the defendant also understood that the agreement was binding and would be reinstated in October, 1970 after cancellation of the contract with Standard. That such is the testimony of plaintiff's witnesses is obvious. The record reveals, however, that the defendant's evidence, rather than contradicting, actually substantiates plaintiff's version of the dispute.

On October 16, 1970, at the time the contract with Interstate was to be reinstated, Mr. Wiley, in his termination letter to Standard, stated:

"As you know, we have another agreement for uniforms with Interstate Uniform Rental Service of Portland, Maine, which we find ourselves committed to for another year or so."

This notification was not timely and defendant found itself obligated to receive, and pay for, identical services from two uniform companies. Appreciating the significance of this dual obligation, defendant demonstrated its awareness that the contract with Interstate was still in force after the suspension period. Mr. Wiley testified:

". . . [W]hen I was involved with two companies and I seemed to be the one in the middle, I almost said to whichever one to come up for whatever

protection they will give me, the flip of the coin, I'll go with them . . .."

The result of the defendant's "flip of the coin" solution to its problem was, of course, the indemnification agreement proposed to both Standard and Interstate and to which Interstate did not assent. In seeking indemnification from both companies, defendant surely realized it had two enforceable obligations and refused to reinstate the contract with Interstate only after Standard agreed to indemnification. This is not behaviour evidencing any reliance upon plaintiff's alleged waiver.

On cross-examination by plaintiff's counsel, Mr. Wiley did admit that plaintiff's salesman had told him that the uniform service would be suspended for a period and then reinstated when the contract expired, but denied that he ever assented to this proposal. This denial was, however, inconsistent with his prior statement taken in a deposition of February 18, 1971, in which Mr. Wiley stated that he agreed to the suspension and later reinstatement of the contract. This inconsistency was never adequately explained by defendant.[2]

█ In short, the evidence shows that neither party ever intended to disturb the

contract until defendant discovered his dual obligation. The evidence does show a subsequent oral agreement to modify a written contract so as to suspend performance by both parties until October, 1970, at which time the contract would be reinstated. If there was any waiver of rights to liquidated damages, it was only for the period of this suspension. This conclusion is supported not only by the testimony of the plaintiff, but by the acts and testimony of the defendant's President as well. The only reasonable interpretation of the record is that both the plaintiff and the defendant were aware that the suspension was offered only to extricate the defendant from a dilemma of his own making and that the contract would be reinstated when the defendant terminated its obligation with Standard. We find no evidence of plaintiff's intention to permanently waive its rights under the contract or of defendant's reliance upon any supposed waiver. Both plaintiff and defendant believed that for the remaining term of the contract they would be bound by its terms, including the provision for liquidated damages. Because defendant does not deny that it refused to comply with the agreement, we can only conclude that defendant's refusal to reinstate the contract constituted an actionable breach.

2. "Q You are certain of that as you are of all your testimony?
A I like to be certain, I'm under oath.
Q You remember when we took a deposition in this case?
A Right.
Q And, referring to page 10 of the deposition, would you read, please, beginning at line 18?
A . 'Well, was there any discussion about terminating service? No, discussion was that John said, "Harold, you have got no worries. I will pull this out and come back in October.'
Q What's the next statement?
A 'Did you agree to that? Yes, I did.'
Q This was your deposition?
A Well, it could be possible.
Q Is that what you said at that time? Do you recall saying that during the time of the deposition?
A Must have.

Q Now, really, there wasn't any question in your mind was there, that you were under contract to Interstate and you felt that you were obligated to them under that contract?
A Well, as the case went on, there was a question.
Q Was there any question in October of 1970 when the uniforms were going to be ostensibly reinstated?
A Yes, sir.
Q There was a question in your mind whether you were obligated to Interstate?
A Yes, sir.
Q Did that question in your mind come about as a result of discussions with representatives of Standard Linens?
A Yes, sir.
Q And, did you have letters back and forth with Standard Linen concerning this matter?
A Yes, we did."

### III. Liquidated Damages

 The presiding Justice found that even in the absence of waiver, the Court would not enforce the liquidated damages provision in the Uniform Rental Agreement because the damages stipulated bore no rational relation to the plaintiff's actual loss. Concluding that the liquidated damages were more than double any possible loss actually sustained by the plaintiff, the Justice held that the liquidated damages were so grossly disproportionate as to be penal. The determination of whether the provision is to be treated as liquidated damages and so enforced, or as a penalty and disregarded, is a question of law (*Wade & Dunton, Inc. v. Gordon*, 144 Me. 49, 64 A.2d 422 (1949) ) and we review accordingly.

 This Court has often said that an agreement made in advance of breach, fixing the damages thereon, is not enforceable unless the damages caused by the breach are very difficult to estimate accurately and the amount so fixed is a reasonable forecast of the amount necessary to justly compensate one party for the loss occasioned by the breach. *Dwinel v. Brown*, 54 Me. 468 (1867); *Maybury v. Spinney-Maybury Co.*, 122 Me. 422, 120 A. 611 (1923); accord, *Mead v. Anton*, 33 Wash.2d 741, 207 P.2d 227 (1949). These two requirements, one demanding reasonable pre-estimation and the other calling for damages incapable of pre-estimation, appear contradictory. Yet· this apparent contradiction is reconciled in the fundamental goal of contract law—protection of the parties' reasonable expectations:

> "The parties themselves best know that their expectations are in regard to the advantages of their undertaking, and the damages attendant on its failure, and when they have mutually agreed upon the amount of such damages in good faith, and without illegality, it is as much the duty of the Court to enforce that agreement as it is the other provi-

sions of the contract." *Dwinel v. Brown*, supra at 470.

The two above requirements mean simply that the reasonableness of the amount stipulated as liquidated damages is to be examined as of the time the contract was formed and that the amount must be reasonable both in terms of the subject matter of the contract and the parties' situation. and as a prediction of the harm resulting from a prospective breach. The requirement that damages must be difficult to ascertain is actually a corollary to the general requirement of reasonableness; if damages could be easily ascertained liquidated damages would be of little use since any departure from the actual harm would be looked upon as unreasonable.

 This Court has held that the question of whether a stipulated amount is liquidated damages or a penalty shall be resolved by finding the intent of the parties. *Maybury v. Spinney-Maybury Co.*, supra. Clearly that holding does not mean that the Court must follow the intent as it appears on the face of the contract, for so doing would require the Court to uphold any provision designated "liquidated damages" since the parties have clearly stated that they intend to pay that amount in the event of breach. We believe that the statement is more reasonably interpreted to mean that the Court will enforce a good-faith attempt to fix a sum as the equivalent of the prospective injury. The good faith of the parties can be determined by circumstances extrinsic to the writing. *Maybury v. Spinney-Maybury Co.*, supra. An excessive sum suggests that the parties did not make a good-faith effort to pre-estimate the actual loss. We have said, therefore, that the liquidated damages must not be disproportionate to the damage which could, at the time the contract was formed, be anticipated from a breach of the contract. *Burrill v. Daggett*, 77 Me. 545, 1 A. 677 (1885). Obviously, if the sum is not reasonable, that is, not the product of a good-faith attempt to anticipate

922

actual loss, the label "liquidated damages" will not prevent the Court from calling it a penalty and refusing to enforce it. *Bignall v. Gould*, 119 U.S. 495, 7 S.Ct. 294, 30 L. Ed. 491 (1886).

■ Applying the general principle that liquidated damages must be a reasonable forecast of the injury resulting from a prospective breach to the present case, we conclude that the presiding Justice erred in characterizing the amount as penal and should have enforced the liquidated damages provision.

The contract provides that liquidated damages shall be

". . . the total of (1) one half of the aggregate weekly service charge, then in effect, for the balance of the term of this Agreement and (2) the loss charge for any uniforms or articles not returned to Interstate at any such breach or termination, together with all costs, including reasonable attorney fees, incurred by the Company in enforcing its rights hereunder."

The plaintiff calculates that one half the aggregate weekly service charge for the balance of the contract term on the date of breach is $3078.90. This sum was arrived at by multiplying the remaining term of the contract, 99 weeks, by one half of $62.-20, the weekly service charge. The plaintiff also asked for attorney's fees of $1000.-00 and costs.

■ The plaintiff's general manager testified that the initial expenses of a new account are so great that the company realizes no profit from a service contract until its second year. He estimated that the initial expense for the garments was between $1000.00 and $1200.00 and that the expense of tailoring and lettering each garment was approximately "a couple of hundred dollars". He stated, moreover, that the sales commission paid on this new account was $540.00. In light of these heavy

"up-front" expenses, we think that, examined at the time the contract was formed, the liquidated damages were a reasonable pre-estimation of the plaintiff's loss. By making the time remaining under the contract a measure of the damages, the liquidated damages are reasonably related to the loss sustained by a breach. Every week the contract continues to run provides the plaintiff with an increasingly greater opportunity to recover his initial investment and realize some profit on the agreement and entails correspondingly lower damages in the event of breach.

Remembering that the primary purpose of damages is to compensate for loss, we do not think that the record shows that the plaintiff's losses in the event of breach were capable of being easily ascertained. The uncontradicted testimony of the plaintiff's general manager indicated this difficulty. He was unable to say what the Company's recoupment would be on the reuse of the uniforms returned after the contract was breached. He also stated that the general overhead attributable to the account could not be determined. This is not a case in which plaintiff suffered no loss or in which that loss was not caused by the defendant's breach. *See Massman Constr. Co. v. City Council of Greenville, Miss.,* 147 F.2d 925 (5th Cir. 1945). Nor can we say that the stipulated sum is so grossly disproportionate to the actual damages that it should be deemed a penalty. *MacNeill Real Estate v. Rines*, 144 Me. 27, 64 A.2d 179 (1949). We believe that the liquidated damages provision should be enforced against the defendant.

■ We do, however, quarrel with the figures used by the plaintiff in calculating damages. The plaintiff has apparently used the entire two years for which the contract was supposed to run, less the five weeks during which both parties actually performed. In addition to those five weeks, the plaintiff should also subtract from the life of the contract the period

during which it was suspended by mutual agreement. It would be inequitable to permit the plaintiff to enforce this obligation during a period for which it waived performance under the contract. Finally, while attorney's fees may be collected as an element of damages, where the parties have so provided by contract (*Alland v. Consumers Credit Association,* 476 F.2d 951 (2d Cir. 1973)), the record contains no evidence of whether the $1000.00 here requested is a reasonable sum.

The entry must be:

Appeal sustained.

Remanded to the Superior Court for a determination of the amount of liquidated damages and reasonable attorney's fees.

DELAHANTY, J., sat at argument but did not participate further in the case.