The CIT GROUP/EQUIPMENT
FINANCING, INC.,
Plaintiff,

v.

ACEC MAINE, INC., et al., Defendants
and Third-Party Plaintiffs,

v.

DOWN EAST PEAT, L.P., Third–
Party Defendant.

Civ. No. 90–0304–B.

United States District Court,
D. Maine.

Jan. 16, 1992.

Peter L. Murray, Murray, Plumb & Murray, Portland, Me., Donald J. Rapson, Livingston, N.J., for plaintiff.

Catherine A. Lee, Peter J. Rubin, Bernstein, Shur, Sawyer & Nelson, Portland, Me., for defendants.

ORDER AND MEMORANDUM
OF DECISION

BRODY, District Judge.

This matter is before the Court on Plaintiff's Motion for Partial Summary Judgment and the mirror image, Defendants' Cross Motion for Partial Summary Judgment. The issue before the Court is the Plaintiff's claim, as secured lender and assignee of a construction contract, for liquidated damages and Defendant's counterclaim challenging the enforceability of the contract provision.

## I. BACKGROUND

On July 12, 1985, Third Party Defendant Down East Peat, L.P. ("Down East") entered into a contract with Defendants, ACEC–SKG, a consortium consisting of ACEC, S.A. (now, ACEC Union Miniere) and Standardkessel Gellschaft ("SKG"), for the engineering, design, procurement and construction of an electrical generating facility (the "Facility") in Deblois, Maine. This contract ("Construction Contract") was amended on Nov. 19, 1985, September 18, 1986, and again on March 17, 1987.

Pursuant to various loan documents and agreements, Plaintiff CIT Group/Equipment Financing Inc. ("CIT") provided construction and working capital financing to Down East. In all, CIT advanced $55,273,-516.94, none of which has been repaid. In order to secure its obligations to CIT, Down East assigned to CIT, among other things, all its rights, title and interest in the Construction Contract.

Defendants ACEC, S.A., and SKG each undertook to be jointly and severally liable for each obligation under the Construction Contract. On March 16, 1987, ACEC–SKG assigned its interest in the Construction Contract to Defendant ACEC Maine. By this agreement ACEC Maine acquired all the rights and obligations of ACEC–SKG under the Construction Contract. ACEC–SKG, however, remained liable under the Construction Contract to Down East and its assignee CIT. Both ACEC–SKG and ACEC Maine consented to the assignment of the Construction Contract to CIT as the entity providing financing for the project.

Pursuant to Section 8.2.2 of the Construction Contract, the Contractor was required to conduct certain performance tests one year after the date of Substantial Completion of construction (the "One Year After Test") to demonstrate the efficiency and reliability of the Facility.

On June 16, 1989 Down East issued a Certificate of Substantial Completion. Nine months later, in what has been described as a highly unusual event, turbine generator No. 2 failed. On June 16, 1990, the date on which the One Year After Test was to have been performed, the turbine generator was still undergoing warranty repairs. As a result, the Facility was incapable of meeting the output and heat rate efficiencies at the Guaranteed Performance Level until August 11, 1990, 56 days after the tests were to have been performed.

## II. SECTION 8.2.2

Plaintiff brings this action to enforce Section 8.2.2 of the Construction Contract and seeks damages from Defendants ACEC Maine, ACEC Union Miniere (as successor-in-interest to ACEC, S.A.), SKG and Insurance Company of North America, in the amount provided under this section's provision for liquidated damages. Section 8.2.2 of the Construction Contract provides:

"One year after Substantial Completion, Contractor shall again perform the Performance Tests. If the actual output or heat rate efficiency of the Project's electrical generating equipment, as demonstrated by such Performance Tests (at the same time as the Project meets all other standards and specifications set forth in Appendix D) and as calculated by the formulae set forth in Appendix D, is less than the Project's actual output or heat rate efficiency, respectively, finally determined pursuant to Section 8.2.1 (the "Revised Performance Level"), Contractor shall, for a reasonable period not to exceed one month, be required to use its best efforts to repair or replace such structures or equipment as is necessary to achieve the Revised Performance Level. At the end of such period, Contractor shall be liable for a one-time payment of liquidated damages for failure to achieve the Revised Performance Level in amount equal to the net present value (calculated as of the Delivery Date using a discount factor equal to the ten-year Treasury bond rate as of the Delivery Date plus two percentage points of lost revenues) of lost revenues sustained by Owner as a result of such failure to achieve the Revised Performance Level. For the purposes of this Section 8.2.2, "lost revenues" shall be deemed to be equal to (a) with respect to output below

the Revised Performance Level, the weighted average price (expressed in cents per kilowatt-hour) required to be paid under the power sales agreements then in effect for the sale of the Project's output, multiplied by the difference between the actual output of the Project (rounded off to the next highest increment of 228 kilowatts) and the Revised Performance Level over a period of 19 years at an availability of 85% (expressed in kilowatt-hours), and (b) with respect to efficiency below the Revised Performance Level, the amount that would be determined under clause (a) of this sentence after substituting for the actual output of the Project the output that would have been achieved if the Project had used only the Revised Guarantee Level Fuel Amount. For purposes of this Article 8, the "Revised Guarantee Level Fuel Amount" is the quantity of fuel that would be required to generate electrical output at the Revised Performance Level, assuming efficiency of the Project equal to the Revised Performance Level."

Section 8.2.3 further provides:

"In no event shall the liquidated damages payable pursuant to this Section 8.2 (when added to any liquidated damages payable pursuant to Section 7.2) exceed the Contract Price. Owner and Contractor hereby acknowledge and agree that the term conditions and amounts fixed pursuant to this Article 8 for liquidated damages are reasonable considering the damages the Owner would sustain in the event of Contractor's failure to achieve the Guaranteed Performance Level, and these amounts are agreed upon and fixed as liquidated damages because of the difficulty of ascertaining as of the date hereof the exact amount of damages that would be sustained by Owner, and shall be applicable regardless of the actual amount of damages sustained. Owner and Contractor further acknowledge and agree that payment of these liquidated damages shall be the sole remedy of Owner against Contractor and the sole liability of Contractor to Owner for the Failure to achieve the Guaranteed Per-

formance Level, and that Contractor shall not be otherwise liable for any incidental or consequential damages or for lost profits as a result of such failure; provided, however, that such payment of liquidated damages shall not affect Owner's right to terminate this agreement pursuant to Section 15.2, or (b) right to liquidated damages pursuant to 7.2.

## III. APPLICABILITY

██ It is undisputed that on June 16, 1990, the Facility was unable to perform at the Guaranteed Performance Level. It is further undisputed that at no time within the 30 day repair period was the Facility capable of performing at the performance level required by Section 8.2.2.

Pursuant to Section 8.2.2 Plaintiff seeks liquidated damages in accordance with the formula set forth therein. Defendants seek to avoid the effect of the liquidated damages provision on the ground that the provision was not triggered by the failure of turbine generator No. 2. Defendants contend that the liquidated damages provision can only be reasonably interpreted to apply to "permanent" failures; contrasted to the failure in this case, which Defendants characterize as a "temporary failure due to warranty repairs." The Court disagrees.

██ An examination of Section 8.2.2 reveals that the payment of liquidated damages, calculated in accordance with the formula, is triggered by the "failure to achieve the Revised Performance Level." The word "permanent" is not used in Section 8.2.2. The provision is precise, and not susceptible to different interpretation. Nor does examination of the contract as a whole dictate a different result. Where contractual language is unambiguous the Court will give the provision its "plain and commonly accepted meaning." *Brackett v. Middlesex Ins. Co.*, 486 A.2d 1188, 1189–90 (Me.1985). If, as Defendants urge, the parties intended the provision to apply only to "permanent" failures the parties could have so contracted. They did not. Instead, the parties negotiated a functional approach to liability. Accordingly, the

Court finds that the liquidated damages provision was triggered when the Facility failed to meet the performance levels within the 30 day grace period as required by Section 8.2.2 of the Construction Contract.

In the alternative, Defendants contend that by successfully performing the One Year After Tests on August 11, 1990, they substantially performed their obligations under Section 8.2.2. In so arguing, Defendant mischaracterizes the purpose of Section 8.2.2. As discussed *infra*, Section 8.2.2 requires that certain tests be performed one year after the date of Substantial Completion in order to test the Facility's efficiency and demonstrate its *reliability*. Obviously, if a one day test is designed to demonstrate reliability, the fact that date is predetermined is of utmost importance. This is even more apparent when a thirty day window for repairs is included. By integrating into the damages provision a time frame for performance, the parties evidenced their intention that the timing of the tests was as important as the standards to be met. Time being of the essence, Defendants did not substantially perform their obligations.

## IV. ENFORCEABILITY

■ In their request for declaratory judgment Defendants contend that the liquidated damages provision, Section 8.2.2, is a penalty and as such is unenforceable. "The enforceability of a liquidated damages provision is a question of law." *Pacheco v. Scoblionko*, 532 A.2d 1036, 1038 (Me.1987). "For a provision for liquidated damages to be enforceable, the requirements are two-fold." *Dairy Farm Leasing Co. v. Hartley*, 395 A.2d 1135, 1137 (Me.1978). An agreement made in advance of breach, fixing the damages thereon, is enforceable only if, "(a) the damages caused by the breach are very difficult to estimate accurately and (b) the amount so fixed is a reasonable forecast of the amount necessary to justly compensate one party for the loss occasioned by the breach of the other party." *Dairy Farm Leasing Co.*, 395 A.2d at 1137; *Interstate Industrial Uniform Rental Service, Inc. v. Couri Pontiac, Inc.*, 355 A.2d 913, 921 (Me.1976);

*Aim Leasing Corporation v. Bar Harbor Airways, Inc.*, 499 A.2d 154, 156 (Me.1985). As the Maine Law Court has explained, these two requirements mean that the reasonableness of the amount stipulated as liquidated damages is to be examined as of the time the contract was formed and that the amount must be reasonable both in terms of the subject matter of the contract and the parties' situation and as a prediction of the harm resulting from a prospective breach. *Interstate*, 355 A.2d at 921. "The Court will enforce a good faith attempt to fix a sum as the equivalent of the prospective injury." *Dairy Farm*, at 1137.

Applying these principles to the facts in this case, the Court finds that the provision for liquidated damages, Section 8.2.2 of the Construction Contract, meets the two-fold requirement. Hence the provision is enforceable.

### (i) DAMAGES CAUSED BY BREACH MUST BE DIFFICULT TO ASCERTAIN

The Construction Contract was a so called "design build" "turn-key" contract. The One Year After Test was designed to demonstrate to the Owner the Facility's expected ability to perform reliably at specified design levels over its lifetime. Defendants contend that the damages which resulted from the 56 day delay are easily quantifiable and therefore the Court should not uphold the award of liquidated damages. In making this argument, however, Defendants again mischaracterize the harm that the liquidated damages provision was designed to remedy. The liquidated damages provision was not designed to compensate the Owner only for the profits lost each day that the Facility was under repair. Rather, the failure to meet the performance levels signalled to the parties and particularly to the Owner that the Facility was not demonstrably reliable or efficient. The unknown risk, the risk for which the damages were designed to compensate, was whether the Facility would continue to be unreliable or inefficient for the rest of its lifetime. The parties agreed to treat the results of the One Year After Test as a

harbinger and shifted the risk accordingly. That is, the parties agreed that if the Facility performed at the Guaranteed Performance Level the Contractor would be relieved of its liability under the Construction Contract for the plant's failure to perform at the specified levels over the plant's lifetime, including incidental and consequential damages. On the other hand, if the Facility was unable to meet the performance standards, as it was unable to do in this case, the Owner would be compensated by a one-time payment according to a formula.[1] Viewed from this perspective, the damages ultimately suffered as a result of the Facility's inability to meet the required performance levels were not easily quantifiable. The parties negotiated a payment for damages that contemplated plant performance over several potential scenarios. The damages in a particular failure would obviously depend upon its nature and extent, the probability of a reoccurrence during the Facility's expected lifetime, the resultant losses both real and consequential, and the cost and extent of repairs during the Facility's expected 19 year life span. As the Contract itself states: "Owner and Contractor hereby acknowledge and agree that the term conditions and amounts are agreed upon and fixed as liquidated damages because of the difficulty of ascertaining as of the date hereof the exact amount of damages that would be sustained by Owner, and shall be applicable regardless of the actual amount of damages sustained." Section 8.2.2.

In effect Section 8.2.2 represents an agreed upon estimate, made by the parties at the time they entered into the contract, of the extent of the injury that would ultimately be sustained as a result of a failure to meet the Guaranteed or Revised Performance Level. The Court finds that at the time of contracting the amount of such damages was difficult to ascertain.

**(ii) REASONABLE FORECAST**

In *Pacheco* the Law Court held that the fixing of an excessive sum is evidence that the parties did not make a good faith effort to pre-estimate the actual loss. *Pacheco*, 532 A.2d at 1038. Defendants contend that like the damages in *Pacheco* the liquidated damages in this case are excessive and therefore not enforceable. *Pacheco* is however, not controlling.

In this case the parties made a careful and conscientious effort to fix a reasonable sum for anticipated damages that would be difficult to estimate. Section 8.2.2 sets forth a precise formula for measuring liquidated damages. The formula is evidence of a deliberate attempt by the parties to create a liquidated damages sum to approximate the prospective injury. Test formulae such as those in the Construction Contract are often used in the industry as a reasonable approximation for the calculation of liquidated damages. Clearly the actual loss resulting from the failure could be less than the amount provided for. It is equally evident, however, that in many other situations the actual loss could exceed the agreed upon cap of $32,276,440. To construe the provision as a penalty the Court would have to find that the amount provided for bore no reasonable relation to the damages the parties thought might be sustained. Such is not this case.

Nor can the Defendants claim that the provision was placed in the contract for its *in terrorem* effect. The liquidated damages provision was the product of full, fair and arms-length negotiations between large sophisticated commercial parties. As the Court in *Interstate* emphasized,

> "the parties themselves best know that [sic] their expectations are in regard to the advantages of their undertaking, and the damages attendant on its failure, and when they have mutually agreed upon the amount of such damages in good faith, and without illegality, it is as much the duty of the Court to enforce that

---

1. Simplified this formula is: current sales price of electricity, multiplied by target output minus actual output, multiplied by operating hours in a year, multiplied by 19 years. In this case the sum would equal $167,646,000. However, Sec-

tion 8.2.3 places a ceiling of $32,276,440 (the full contract price) on the amount of liquidated damages for which the Defendants can be held liable.

agreement as it is the other provisions of the contract."

*Interstate*, 355 A.2d at 921. The Court does not find the liquidated damages provision, Section 8.2.2, to be an unreasonable prediction of the harm resulting from a prospective breach. Accordingly, it will be enforced.

### (iii) LOOKING BACKWARD

Finally, Defendants contend that the Court should find the liquidated damages provision unenforceable in light of the harm which resulted directly from the 56 day delay. In effect, Defendant is again attacking the reasonableness of the liquidated damages provision, although unlike their argument *supra*, which examined the provision from the perspective of the parties at the time of contracting, this attack is waged retrospectively with the advantages of hindsight.

While the Court does not completely rule out situations in which the amount of damages actually incurred might in retrospect be determinative in evaluating the validity of a liquidated damages provision, *see, e.g.*, *Pacheco*, in the instant case, a retrospective view is inappropriate. As noted *supra*, the One Year After Test was designed as a demonstration of the Facility's ability to provide a sustained and reliable flow of power which could be expected to last over the lifetime of the project. The hypothesis underlying Section 8.2.2 is that a failure which cannot be repaired within thirty days of the Year After Test date would be viewed as symptomatic of a potentially more serious problem or an ongoing inefficiency or unreliability which might ultimately threaten the Facility's viability. Defendants' contention that the Court need only concern itself with the damages occasioned during the 56 day delay itself ignores the purpose of the liquidated damages provision. Such an argument would also invite a plethora of evidence in order to prove the short term damages and estimate the potential long-term damages that the failure of turbine generator No. 2 may have indicated. It is precisely this type of

situation that the parties intended to avoid by contracting for the one-time payment of liquidated damages. As the court in *Southwest* stated:

"Where parties have by their contract agreed upon a liquidated damages provision as a reasonable forecast of just compensation for breach of contract and damages are difficult to estimate accurately, such provision should be enforced ... It is not unfair to hold the [breaching party] to such agreement if by reason of later developments damages prove to be less or non-existent. Each party by entering into such a contractual provision took a calculated risk and is bound by reasonable contractual provisions pertaining to liquidated damages."

*Southwest Engineering Co. v. United States*, 341 F.2d 998, 1003 (8th Cir.1965).

### V. CONCLUSION

The Court finds the liquidated damages provision to be enforceable. THEREFORE, Plaintiff's motion for partial summary judgment is hereby GRANTED. Defendants' request for declaratory judgment or in the alternative, Defendants' motion for partial summary judgment is hereby DENIED. Defendants are ORDERED to pay Plaintiff liquidated damages in accordance with the formula set forth in Section 8.2.2 of Construction Contract.[2]

---

**2.** The Court does not make a finding with regard to the issue of contribution, particularly as it relates to Defendant INA. The Court will address this issue, if necessary, upon the filing of an appropriate motion.