STATE OF MAINE                    BUSINESS AND CONSUMER COURT

Cumberland, ss.

CMCC LOT 14, LLC

Plaintiff

v.                                      Docket No. BCD-CV-12-19

CPI AUGUSTA DOR, LLC

Defendant

## ORDER ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff's Motion for Summary Judgment is before the court for decision, oral

argument having been held August 27, 2012. For the reasons stated herein, Plaintiff's Motion

for Summary Judgment is denied.

*Background*

The material facts relevant to the Motion are essentially undisputed, being largely set

forth in a Stipulation of Fact executed by both parties, which includes as attachment all of the

documents and communications referred to herein, and which is hereby incorporated in its

entirety with attachments. The parties do not agree, however, on the inferences to be drawn

from, and the legal significance of, the undisputed facts. The essential facts are as follows:

Both parties are limited liability companies formed primarily or exclusively in

connection with the development of a 105,500 sq. ft., four-story office building to be

constructed in the Central Maine Commerce Center in Augusta, Maine (the "Project").

Plaintiff CMCC Lot 14, LLC (CMCC) was the developer of the Project. Defendant CPI

1

Augusta DOR, LLC (CPI) was to be an investor in the Project and was also responsible for arranging financing.

1. The Investment Agreement

In August 2011, CMCC and CPI entered into a contract titled "Revised and Restated Investment Agreement," under which CPI was to acquire an ownership interest in the Project in exchange for investing in the Project and helping arrange financing.[1] The August 2011 Investment Agreement superseded a previous contract between the parties entered into in June 2011. The second and final version of the Investment Agreement is referred to as "the Investment Agreement," and the initial version of June 2011 is referred to herein as the Prior Agreement.

Among other things, the Investment Agreement spelled out the essential financial arrangements for funding the cost of the development:

- CPI and CMCC would work collaboratively to obtain a loan of approximately $11.8 million to cover 80% of the budgeted Project costs (the "Senior Financing", as that term is defined in the Investment Agreement)

- CPI would make a capital contribution of about $2.5 million toward the remaining 20% of the cost

- The two principals of CMCC, Mark Woglom and Greg Kirsch, would contribute an additional $515,124.

The Investment Agreement called for a simultaneous closing on the Senior Financing, the capital contributions and a land purchase agreement as follows: "The date upon which the

---

[1] The parties' transaction also involved other contracts, the terms of which are not material to the Plaintiff's Motion except as set forth specifically in this Order.

2

Land Closing occurs, the Senior Financing occurs and the Capital Contributions are made shall be referred to as the "closing date".

Section 15 of the Investment Agreement also contained an integration provision to the effect that the Investment Agreement superseded all prior agreements and contained the entire understanding of the parties. It included a provision stating" "This Agreement may not be amended, except in a writing signed by each of the Parties hereto," "the Parties" being defined in the first paragraph of the Investment Agreement as being CMCC and CPI.

Finally, the Investment Agreement included the termination provisions that form the primary basis of Plaintiff's Motion for Summary Judgment. At section 3(b), the Investment Agreement provides:

> In the event that the Senior Financing Closing does not occur by September 30, 2011, this Agreement shall automatically terminate with the same result as a termination under Section 12(a) below. The date in the foregoing sentence shall be extended one day for each day after September 15, 2011, that the sellers under the Land Purchase Contract and the Lease Purchase Contract fail to provide final forms of all easements, covenants, declarations, agreements, and consents required under the Land Purchase Contract and the Lease Purchase Contract, but such extension shall not extend beyond October 14, 2011.

The foregoing "automatic termination" provision did not appear in the June 2011 Prior Agreement.

Section 12 of the Investment Agreement provides as follows:

Termination. This Agreement may be terminated prior to the Closing Date

(a)     by mutual agreement of the parties hereto;

(b)     by [CPI] if 14 LLC agrees to any Modifications to the Real Estate Documents affecting the Premises that exceed the limits set forth in the last sentence of Section 9(a).

3

(c)     If the Parties in spite of their reasonable efforts are unable to close the Land Purchase and the Lease Purchase in accordance with the terms of this Agreement and the Senior Financing (unless [CPI] exercises its option to close without the Senior Financing pursuant to Section 3(b)) by October 15, 2011, this Agreement shall automatically terminate without action by or notice to either Party.

Upon the rightful termination of this Agreement pursuant to this Section 12 (a) or Section 12 (b), the Broker shall return the Deposit to [CPI]. Upon termination of this Agreement pursuant to Section 12 (c) all development costs incurred by 14 LLC to such date shall be paid by 14 LLC from the Deposit with the costs allocated 50% to [CPI] and 50% to Woglom and Kirsch, and any remaining deposits shall be returned to the parties. Except for the Deposit as discussed in the preceding sentence, no Party shall be entitled to a return of its financial contribution to the Project upon termination of this Agreement. Upon termination, neither Party nor Woglom or Kirsch shall have any further obligation or liability to one another for any reason whatsoever, provided, however, that notwithstanding the foregoing or anything to the contrary contained herein, Sections 10, 11, 14, 15, 16, 17 and 20 hereof shall expressly survive the termination of this Agreement. Termination of this Agreement shall not affect the liability of a party for breach of any of the terms hereof prior to termination.

## 2. The October Communications

By October 2011, the parties had identified Androscoggin Savings Bank ["the Bank"] as the source of the "Senior Financing" for about 80% of the cost of the Project. The Bank issued a loan commitment letter that included the following provision:

> The Bank's obligation to make loans or advances hereunder is hereby expressly conditioned upon receipt by the Bank of any reports, instruments or documentation as required herein and which are satisfactory to the bank. If the terms and conditions as herein stated are satisfactory, please sign this letter signifying your acceptance and return a signed and accepted copy by October 14, 2011 as your authorization for us to proceed. If we do not receive your written acceptance as requested, this commitment will expire at that time. Whether or not the aforesaid conditions are met, the loan must close by October 28, 2011, or this commitment will expire. Any extension of this commitment must be in writing and signed by both parties.

4

On October 7, 2011, Greg Kirsch sent an e-mail message to a commercial loan officer at Androscoggin Savings Bank, forwarding the Bank's commitment letter executed in counterpart by CMCC and Kirsch and Woglom as individual indemnitors for the Senior Financing loan. In his October 7, 2011 e-mail message to the Bank, Mr. Kirsch wrote: "We would like to target October 20[th] for the closing of the land purchase and the loan. I will try to get all of the various parties and attorneys to confirm availability. If the 20[th] is not workable, I would suggest the 19[th]."

On October 10, 2011, Lynnette Rich, CPI's attorney, emailed to the same Bank loan officer the commitment letter executed in counterpart by CPI through its sole member, SPC Associates, LLC.

In an October 13, 2011 email to representatives of CPI, Mr. Kirsch forwarded Androscoggin's "Preliminary Closing Agenda (Revised on 9/28/11)" and added in the text of his e-mail message:

> Note that closing will now in all likelihood be 10/27 or 10/28 for Mattson to complete his work and get Square Mile approval.... We will need to update the CMCC Lot 14, LLC Operating Agreement to reflect the agreed loan amount and equity contribution, which I will turn to shortly.[2]

As far as the record shows, the October 15, 2011 closing deadline and automatic termination date passed without comment by either party. Between October 15 and October 31, the parties engaged in a series of communications spelled out in detail in paragraphs 12(a)-12(ff) of the parties' Stipulation of Fact, only a few of which need to be mentioned in detail here.

---

[2] Mattson Development, LLC was the Manager of Commerce Center Management, LLC, the general partner of Central Maine Commerce Center, the seller in the Land Purchase Contract and Square Mile was a new lender. CPI's Opposing Statement of Facts ¶21.

On October 17, 2011 there began a series of e-mails between CMCC and CPI regarding the Bank's requirement of a $3.8 million cash contribution at the closing. The parties had contemplated putting up about $3 million, so the Bank's requirement was about $800,000 more than anticipated. Mr. Kirsch in an October 18 message CPI made it clear that "the extra equity has to come from your group." Mr. Kirsch sought assurances from CPI that CPI was still able and willing to participate. The e-mail exchanges between the parties reflects an increasing level of anxiety on the part of Mr. Kirsch during the October 18-20 period, ending when he apparently received assurances that CPI would proceed.

The week of October 24-28 saw the parties focusing on closing documents and other details. In an October 23, 2011 e-mail message to CPI representatives, Mr. Kirsch on behalf of CMCC wrote:

> 4. Since we are now ready to move to closing, I will not update the Investment Agreement since it is basically an agreement to close. I will make all changes and updates to the LLC Agreement which will survive the closing.

On October 24, 2011, Mr. Kirsch on behalf of CMCC sent another e-mail message to CPI saying, "Here is a redlined version of LLC agreement and all exhibits that I believe captures all of the terms of our Restated Investment Agreement."

. Mr. Kirsch had already flagged October 27 or 28 as dates for closing, and began pressing CPI to wire the funds reflecting its commitment into an escrow account in anticipation of a closing. For example, in a message October 26, 2011, Mr. Kirsch asked if CPI could close the next day—October 27. CPI

6

responded noncommittally, indicated that the closing might take a day or two longer. On October 29, 2011, a Saturday, Mr. Kirsch notified CPI that CPI had to take certain steps associated with the closing—notably funding an escrow arrangement in anticipation of closing—by Monday, October 31, 2011, or CMCC would proceed with the project without CPI's involvement.

On Monday, October 31, CPI through different representatives responded by saying that an unexpected storm closing would likely delay CPI's completion of its funding commitment, and also by asking for CMCC to take certain steps as a condition to CPI funding its commitment. On the same day, CMCC through Mr. Kirsch electronically transmitted a signed limited liability company operating agreement with a cover e-mail message indicating, "As per all correspondence, null and void if not funded and signed by 5 pm today."

CPI did not execute the agreement or fund its commitment by 5 p.m. October 31, 2011. That evening Mr. Kirsch sent an e-mail message to various parties involved in the transaction, including representatives of CPI, noting that CPI had not executed the agreement or funded the escrow arrangement and stating, "[a]s per prior correspondence with all parties, the transaction is terminated."

The next day, November 1, 2011, CPI sent Mr. Kirsch a conciliatory message in which CPI proposed to move ahead with the transaction. However, CMCC through Mr. Kirsch maintained that CPI's failure to take the steps CMCC had outlined by October 31, 2011 meant that CPI's involvement in the project had terminated. It was not until on or after November 7, 2011, by which point outside counsel for both parties

7

had become involved, that CMCC took the position that the Investment Agreement had automatically terminated back on October 15, 2011. At some point during or after November 2011, CPI did unilaterally make a tender of performance of at least some of its obligations under the Investment Agreement, but CMCC rejected those actions based on its position that the transaction was terminated.

*Procedural Posture of the Case*

The pleadings in this case focus on the status of the parties' agreement and also recite affirmative claims based on each party's view of the transaction. CMCC's three-count complaint states declaratory judgment claims in counts I and II and a breach of contract claim in count III. As to declaratory judgment, CMCC's primary position, recited in count I, is that the Investment Agreement automatically terminated by its terms under sections 3(b) and 12(a). CMCC's alternate position, stated in count II, is that the Investment Agreement terminated under paragraph 12(c).

In response, CPI has pled waiver and estoppel among other affirmative defenses, and also filed a counterclaim.

Each party views the other as having breached its obligations under the Investment Agreement. CMCC contends that CPI breached both by failing to be ready to close and by injecting new conditions. CPI contends, based on a number of different grounds, that CMCC was not entitled to cancel the transaction as of 5 p.m. October 31, 2011 and is in breach by failing to proceed with CPI.

However, the issue of breach by either party is not yet before the court. When this case was filed, the parties agreed that it would proceed on a bifurcated basis, with

8

the threshold or Phase 1 issue being, as recited in the court's Case Management Scheduling Order No. 1, "whether or not the Revised and Restated Investment Agreement between the parties dated August 30, 2011 was terminated under either section 12(a) of the Agreement or under section 12(c), as alleged by Plaintiff CMCC in its request for declaratory judgment in counts I and II of its complaint."

If the Investment Agreement indeed automatically terminated as of October 15, 2011, the issue of breach could be mooted. If not, the case would move ahead to Phase 2, involving Count III of CMCC's complaint and the affirmative claims contained in CPI's counterclaim.

## Analysis

The familiar summary judgment standard calls for the court to determine whether there are any genuine issues of material fact and, if not, which party is entitled to judgment as a matter of law. *See* M.R. Civ. P. 56. When a party files a motion for summary judgment, the court considers the parties' statements of material facts and any reasonable inferences that a fact-finder may draw from them, to determine whether the moving party is entitled to judgment as a matter of law. M.R. Civ. P. 56; *see Curtis v. Porter*, 2001 ME 158, ¶ 9, 784 A.2d 18. A moving party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, . . . show that there is no genuine issue as to any material fact set forth" in the parties' statements of material facts and "that [the] party is entitled to a judgment as a matter of law." M.R. Civ. P. 56(c); *accord, Beal v. Allstate Ins. Co.*, 2010 ME 20, ¶ 11, 989 A.2d 733.

9

CMCC's position is that the automatic termination provisions of the Investment Agreement constitute, in effect, a condition subsequent that caused the Investment Agreement to terminate without any further action of the parties when the closing did not occur by the deadline stated in the Investment Agreement.

CPI's response does not necessarily dispute the characterization of the automatic termination provisions as a condition subsequent, but CPI says that the parties agreed to modify the sections on which CMCC relies, and in the alternative that CMCC is barred from invoking sections 3(b), 12(a) and 12(c) on theories of waiver and estoppel.

To these arguments, CMCC responds by noting that the alleged modification does not comply with section 15 of the Investment Agreement, which requires any amendment to be in "a writing" signed by both parties. CMCC also says that CPI's waiver or estoppel arguments are not supported in the record.

As explained below, the court concludes that CMCC has not established that it is entitled to summary judgment on the basis that the Investment Agreement automatically terminated as of October 15, 2011, under any or all of the three sections—3(b), 12(a) and 12(c)—that CMCC relies upon for that proposition.

    a. *CMCC's Proposal and CPI's Assent to Extend the October 15 Deadline Either Modified the Investment Agreement as a Matter of Contract Law or Created An Estoppel Precluding CMCC from Invoking the Original Deadline*

As CMCC argues, the material terms of the Investment Agreement are unambiguous. CMCC is also correct that the automatic termination provisions do operate as a condition subsequent. But for the October communications between the

10

parties, sections 3(b) and 12(a) would have effected an automatic termination of the Investment Agreement as CMCC contends.

The first mention of a post-October 15 closing date in the record appears in Mr. Kirsch's October 7, 2011 message to Androscoggin Savings Bank, with copies to CPI representatives, forwarding CMCC's signed counterpart of the loan commitment letter and indicating that CPI's counterpart would be forwarded to the Bank separately. The message states, "We would like to target October 20 for the closing of the land purchase and the loan."

The reference to "we" is not entirely clear from the message, but the logical interpretation is that Mr. Kirsch is speaking to the Bank on behalf of both signatories to the commitment letter, CMCC and CPI, not just on behalf of CMCC. That interpretation implies that CMCC and CPI had already agreed to an extension of the October 15 deadline for purposes of the Investment Agreement, although no explicit evidence of such an agreement appears in the record. Likewise, there is nothing in the record indicating CPI's express assent to CMCC's proposed October 20 closing date, but such assent can readily and reasonably be inferred.

In any event, in contractual terms, Mr. Kirsch's proposal for a closing October 20 constituted an offer to extend the closing deadlines contained in sections 3(b) (October 14 deadline) and 12(c) (October 15 deadline) of the Investment Agreement. CPI's conduct plainly manifested assent to the proposed extension.

CMCC's primary argument against CPI's contention that the parties extended the closing deadline by agreement is that the alleged agreement was never reduced to "a

11

writing signed by each of the Parties hereto," as required by section 15 of the Investment Agreement. It is quite true that there is no single document signed by both parties memorializing the extension of the October 15 closing deadline.

Under Maine law, "any contract may be modified by subsequent agreement of the parties as long as the new agreement itself complies with the requirements of a valid contract." *Maine Mortgage Co. v. Tonge*, 448 A.2d 899, 902 (Me. 1982), *citing* 3 A. Corbin, *Contracts* § 574 (1960 & Supp. 1980). CMCC's proposal to extend the October 15 closing deadline and CPI's assent constitute an agreement to modify that was clearly memorialized in terms sufficient to eliminate any Statute of Frauds issue.[3]

"A provision in a contract that permits only those changes made in writing may be modified by agreement of the parties." *Granger Northern, Inc. v. Cianchette*, 572 A.2d 136, 139 (Me. 1990) (*citing Copeland v. Hewett*, 96 Me. 525, 528-29, 53 A. 36, 37 (1902)). Applied to these facts, that rule means that when CMCC proposed, and CPI agreed, to extend the closing date without putting their agreement in the form contemplated by section 15, they in effect were agreeing to modify the section 15 signed writing requirement as well as the closing deadline itself.

Second, CPI demonstrated the elements of a valid estoppel—it can reasonably be inferred from the record that CMCC's written proposals on October 7 and 13 for closing dates after October 15 foreseeably induced detrimental reliance on CPI's part. CMCC's multiple references to a post-October 15 closing date, beginning in Mr. Kirsch's October 7 e-mail proposal for an October 20 closing, continuing in his

---

[3] Neither party has raised any Statute of Frauds issue nor any issue of there being valid consideration for the agreement to extend the closing deadline, nor does the court see any such issues.

12

October 13 e-mail reference to an October 27 or 28 closing, and repeated several times thereafter, can only be taken as being intended to induce CPI to believe, not only that CMCC agreed to extend the closing deadline stated in the Investment Agreement, but also that CMCC would not insist on the extension agreement being put in the form of a writing consistent with section 15.

In that sense, the scenario here arguably supports the application of both promissory estoppel—Mr. Kirsch's proposal operating as a promise to extend the closing deadline--and if not that, then equitable estoppel—Mr. Kirsch's conduct, short of an actual promise, inducing CPI to believe that CMCC had agreed to extend the October 15 closing deadline—and CPI's reliance in either case. *See Wilson v. Strong*, 474 A.2d 176, 178 (Me. 1984) ("A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise") (quoting RESTATEMENT (SECOND) OF CONTRACTS § 90 (Tent. Draft Nos. 1-7, 1973)); *Dep't of Health & Human Servs. v. Pelletier,* 2009 ME 11, ¶17, 964 A.2d 630, 635 (equitable estoppel "precludes a party from asserting rights which might perhaps have otherwise existed . . . against another person who has in good faith relied upon such conduct, and has been led thereby to change his position for the worse, and who on his part acquires some corresponding right"). Framed in summary judgment terms, CPI has made a prima facie showing of a valid estoppel defense to CMCC's effort to enforce the October 15 deadline against CPI.

13

b. *The Extension of the Closing Deadline Modified But Did not Eliminate the Condition Subsequent Reflected in the Investment Agreement*

CMCC's position rests substantially on its portrayal of the automatic termination provisions of the Investment Agreement as creating a condition subsequent that effectively terminated the Agreement, automatically without act of any party, when the closing did not occur by the stated deadline. So far as that characterization goes, the court agrees with it. The court also agrees with CMCC that the automatic termination provisions of the Investment Agreement were not modified or waived by anything that occurred during the October communications recited above.

CPI has the burden to prove the affirmative defense of waiver—the "voluntary or intentional relinquishment of a known right" *Interstate Indus. Unif. Rental Serv., Inc. v. Couri Pontiac, Inc.,* 355 A.2d 913, 919 (Me. 1976), and it has not met that burden, except as to CMCC's ability to enforce the October 15 deadline. Neither the automatic termination concept nor the provisions that define it were ever discussed—the parties' focus was solely on the date for closing, meaning that their agreement to modify the Investment Agreement was limited to extending the closing deadline as stated in sections 3(b) and 12(c).

Although a waiver can be inferred from a party's conduct and need not be explicitly stated, *see id.,* CPI has not shown any basis on which a broad waiver of the automatic termination provisions could reasonably be inferred from CMCC's statements or conduct In sum, CPI has not shown that CMCC's proposals for a post-October 15 closing went beyond changing the closing deadline itself, or that they

14

altered the provisions defining what would happen if the deadline, as extended, were not met.

On the other hand, CMCC has not shown that the condition subsequent defined in the Investment Agreement operated to terminate the Investment Agreement effective October 15, 2012. Whether the same sections that CMCC relies upon now operated to terminate the Investment Agreement automatically at a later date is a question beyond the scope of this Order, but clearly is a question that will confront the parties in Phase 2.

## Conclusion

Where the foregoing leaves this case is at the threshold of Phase 2, with multiple issues to be explored.[4] Although the record now before the court might permit further findings and conclusions regarding the *dénouement* on and after Halloween, the only question before the court is whether CMCC has established that it is entitled to summary judgment on counts I and/or II of its complaint, which allege that the Investment Agreement automatically terminated as a result of the parties' failure to close their transaction by October 15, 2012. CPI has made a *prima facie* showing of either a valid agreement to extend the closing date beyond October 15, 2011, or a valid estoppel precluding CMCC from enforcing the October 15 2012 closing deadline.

---

[4] These might include: Was there an agreement on an actual closing date? It is clear that CMCC proposed October 27 or 28. Did CPI implicitly or explicitly agree to those dates? Was CPI ready to close? Was CMCC entitled to set a final deadline of 5 p.m. October 31 and to declare the transaction at an end when it was not met? Did CPI have a valid reason or excuse for not taking all the steps CMCC required by that deadline? Did CPI inject new pre-conditions to closing at the last minute or was it entitled to make those requests, or was the contract silent or ambiguous on that point? Did either party commit a breach of their contract—CMCC by declaring the transaction terminated as of 5 p.m. October 31 or CPI by failing to be ready to close by that time? The foregoing is by no means an inclusive list of potential issues remaining, and some of the foregoing may prove not to be issues after all.

15

IT IS HEREBY ORDERED AS FOLLOWS:

1. Plaintiff CMCC's Motion for Summary Judgment is hereby denied.

2. The Clerk will schedule a further Case Management Conference at which counsel
   and the court will discuss the schedule and further proceedings in this case.

Pursuant to M.R. Civ. P. 79(a), the clerk is hereby directed to incorporate this order by

reference in the docket.

Date: September 14, 2012

A. M. Horton
Justice, Business and Consumer Court

Entered on the Docket: 9|14|12
Copies sent via Mail __ Electronically ✓

16

BCD-CV-12-19

CMCC Lot 14, LLC

       Plaintiff

  v.

CPI Augusta DOR, LLC

       Defendant

Attorneys:

Plaintiff:    Jeffrey Piampiano, Esq
               Drummond Woodsum

Defendant:  Aaron P. Burns, Esq
               Joseph J. Hocking, Esq
               Pearce & Dow, LLC Attorneys at Law