**MITSUBISHI CATERPILLAR FORKLIFT AMERICA, INC., Plaintiff,**

v.

**SUPERIOR SERVICE ASSOCIATES, INC. and Craig T. Burkert, Defendants.**

**No. Civ. 99–19–P–C.**

United States District Court, D. Maine.

Dec. 8, 1999.

John Hubbard Rich, III, Fred W. Bopp, III, Perkins, Thompson, Hinckley & Keddy, Portland, ME, Thomas J. Collin, Thompson, Hine & Flory, PLL, Cleveland, OH, for Plaintiff.

Lee Bals, George J. Marcus, Michael Joseph Gartland, Marcus, Grygiel & Clegg, P.A., Portland, ME, for Defendants.

## AMENDED ORDER AFFIRMING THE RECOMMENDED DECISION OF THE MAGISTRATE JUDGE

GENE CARTER, District Judge.

The United States Magistrate Judge having filed with the Court on October 1, 1999, with copies to counsel, his Memorandum Decision on Motions to Strike and Recommended Decision on Cross–Motions for Partial Summary Judgment (Docket No. 53); and Defendants having filed, on October 21, 1999, their appeal from the Memorandum Decision on Motions to Strike and objection to the Recommended Decision on Cross–Motions for Partial Summary Judgment (Docket No. 56), to which appeal and objection Plaintiff filed its response on November 8, 1999 (Docket No. 57); and this Court having reviewed and considered the Magistrate Judge's Memorandum Decision and Recommended Decision, together with the entire record; and this Court having made a *de novo* determination of all matters adjudicated by the Magistrate Judge's Memorandum Decision and Recommended Decision, and concurring with the decision and recommendations of the United States Magistrate Judge for the reasons set forth therein, it is **ORDERED** as follows:

(1) The Magistrate Judge's Memorandum Decision granting Plaintiff's Motion to Strike (Docket No. 43) is hereby **AFFIRMED.**

(2) The Magistrate Judge's Recommended Decision on Cross–Motions for Partial Summary Judgment is hereby **AFFIRMED.**

(3) Defendant's objection to the Magistrate Judge's Recommended Decision is hereby **DENIED.**

(4) Plaintiff's Motion for Partial Summary Judgment is hereby **GRANTED** as to Count I of the Amended Complaint.

(5) Plaintiff's Motion for Partial Summary Judgment is hereby **GRANTED** as to Counts I–IV and VII–VIII of the Counterclaim and is otherwise **DENIED.**

(6) Defendants' Motion for Partial Summary Judgment is hereby **GRANTED** as to Count III of the Amended Complaint and is otherwise **DENIED.**

(7) Defendants' Motion to Strike (Docket No. 40) is **MOOT.**[1]

---

1. The Magistrate Judge granted Defendants' motion to strike portions of the Plaintiff's Opposing Statement of Material Facts. Memorandum Decision on Motions to Strike and Recommended Decision on Cross–Motions for Partial Summary Judgment at 34. It is not clear from the written submissions if Plaintiff has appealed this decision. This Court has reviewed this aspect of the matter and finds

*MEMORANDUM DECISION ON MOTIONS TO STRIKE AND RECOMMENDED DECISION ON CROSS-MOTIONS FOR PARTIAL SUMMARY JUDGMENT* [1]

DAVID M. COHEN, United States Magistrate Judge.

In this action arising out of a business relationship, the plaintiff, Mitsubishi Caterpillar Forklift America, Inc. ("MCFA"), moves for summary judgment on the first two counts of its five-count amended complaint and all counts of the defendants' counterclaim. The defendants, Superior Service Associates, Inc. ("SSA") and Craig T. Burkert, its president and owner of half of its shares, move for summary judgment on Counts II–V of the amended complaint and Counts I and II of their counterclaim. Count I of the amended complaint is asserted against SSA only. Counts III and V of the amended complaint are asserted only against Burkert. The plaintiff and the defendants have each filed motions to strike portions of the materials submitted by their opponents in connection with the motions. I grant one of the motions to strike, and I recommend that the court grant both summary judgment motions in part and deny them in part.

## I. Summary Judgment Standards

Summary judgment is appropriate only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). "In this regard, 'material' means that a contested fact has the potential to change the outcome of the suit under the governing law if the dispute is resolved favorably to the nonmovant. By like token, 'genuine' means that 'the evidence about the fact is such that a reason-

able jury could resolve the point in favor of the nonmoving party....'" *McCarthy v. Northwest Airlines, Inc.*, 56 F.3d 313, 315 (1st Cir.1995) (citations omitted). The party moving for summary judgment must demonstrate an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In determining whether this burden is met, the court must view the record in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences in its favor. *Cadle Co. v. Hayes*, 116 F.3d 957, 959 (1st Cir.1997). Once the moving party has made a preliminary showing that no genuine issue of material fact exists, "the nonmovant must contradict the showing by pointing to specific facts demonstrating that there is, indeed, a trial worthy issue." *National Amusements, Inc. v. Town of Dedham*, 43 F.3d 731, 735 (1st Cir.1995) (citing *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548); Fed. R.Civ.P. 56(e). "This is especially true in respect to claims or issues on which the nonmovant bears the burden of proof." *International Ass'n of Machinists and Aerospace Workers, AFL-CIO, v. Winship Green Nursing Center*, 103 F.3d 196, 200 (1st Cir.1996) (citations omitted).

The mere fact that both parties seek summary judgment does not render summary judgment inappropriate. 10A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* ("Wright, Miller & Kane") § 2720 at 19. For those issues subject to cross-motions for summary judgment, the court must draw all reasonable inferences against granting summary judgment to determine whether there are genuine issues of material fact to be tried. *Continental Grain Co. v. Puerto Rico Maritime Shipping Auth.*, 972 F.2d 426, 429 (1st Cir.

---

that the decision on the motion to strike is not clearly in error.

**1.** The defendants have requested oral argument on the pending motions. Docket No.

45. I am satisfied that the written submissions of the parties adequately address the issues raised. Therefore, the request for oral argument is denied.

1992). If there are any genuine issues of material fact, both motions must be denied as to the affected issue or issues of law; if not, one party is entitled to judgment as a matter of law. 10A Wright, Miller & Kane § 2720 at 24–25.

## II. Procedural Background

Before the pending motions for partial summary judgment were filed, Counts V and VI of the counterclaim were dismissed by stipulation. Docket No. 18. The defendants have now stated that summary judgment in favor of the plaintiff may be entered on Counts III, VII and VIII of their counterclaim. Objection of Defendants/Counterclaim Plaintiffs to Motion of Plaintiff for Partial Summary Judgment and Incorporated Memorandum of Law ("Defendants' Objection") (Docket No. 31) at [1] n. 1. Accordingly, the plaintiff's motion for partial summary judgment will be considered here only with respect to Counts I and II of the amended complaint and Counts I, II and IV of the counterclaim. The defendants' motion is unaffected by these events.

## III. Factual Background

The summary judgment record includes the following appropriately supported material facts that are not in dispute.[2] MCFA is a Delaware corporation with its principal place of business in Houston, Texas and is in the business of manufacturing and distributing lift trucks and parts used in connection with lift trucks. Plaintiff's Statement of Material Facts as to Which There is No Genuine Issue to be Tried ("Plaintiff's SMF") (Docket No. 21) ¶ 1; Defendants'/Counterclaim Plaintiffs' (1) Response to Plaintiff's Statement of Material Facts, and (2) Opposing State-ment of Material Facts Pursuant to D. Me. LR 56(c) ("Defendants' Opposing SMF'") (Docket No. 32) ¶ 1. SSA is a Maine corporation with a former place of business in Gorham, Maine. Plaintiff's SMF ¶ 4; Defendants' Opposing SMF ¶ 4. Defendant Burkert is the president of SSA, owns 50% of its shares, and currently resides in Yarmouth, Maine. Plaintiff's SMF ¶ 5; Defendants' Opposing SMF ¶ 5.

SSA was an authorized dealer for MCFA pursuant to a Sales and Service Agreement dated November 4, 1994 and a Sales and Service Agreement dated March 6, 1995. Affidavit [of Thomas M. Labrador] ("Labrador Aff."), Item 1 in Volume 1, Appendices to Plaintiff's Motion for Summary Judgment, ¶¶ 5–6; Affidavit of Craig T. Burkert in Support of Objection of Defendants/Counterclaim Plaintiffs to Motion of Plaintiff for Partial Summary Judgment ("Second Burkert Aff.") (Docket No. 34) ¶¶ 17, 34. In 1993 Southworth–Milton, Inc., then an authorized dealer for Caterpillar lift trucks located in Maine, informed MCFA that it would discontinue its lift truck operations within 12 months. Affidavit [of Stephen R. Frohbieter] ("Frohbieter Aff."), Item 2 in Volume 1, Appendices to Plaintiff's Motion for Summary Judgment, ¶ 3. Burkert responded to an advertisement that appeared in *The Wall Street Journal* on August 25, 1994 seeking persons interested in a "major brand forklift dealership" for Maine, New Hampshire, Vermont, Massachusetts and/or New York. Second Burkert Aff. ¶¶ 2–4 & Item 3 in Defendants'/Counterclaim Plaintiffs' District of Maine Local Rule 26(c) List Filed in Conjunction With Objection to Motion of Plaintiff for Partial Summary Judgment ("Defendants' Documents")

---

**2.** The defendants have included with their response to the plaintiff's statement of material facts submitted in opposition to their motion for partial summary judgment a "reply statement of material facts." Defendants'/Counterclaim Plaintiffs' (1) Response to Plaintiff/Counterclaim Defendant's Opposing Statement of Material Facts, and (2) Reply Statement of Material Facts Pursuant to D. Me. LR 56(d) (Docket No. 38) at 16–22. This court's Local Rule 56 makes no provision for such an additional statement of material facts to be submitted with a reply memorandum. Indeed, a party may not respond to a reply memorandum without leave of court. The defendants here seek essentially to place before the court asserted facts to which the plaintiff cannot respond. The court will disregard any factual statements submitted by the defendants in this manner.

(Docket No. 33). Burkert met with representatives of MCFA in Texas, who gave him certain documents relevant to the Southworth–Milton dealership. Second Burkert Aff. ¶ 4; Deposition of Mitsubishi Caterpillar Forklift America Inc. ("Plaintiff's Deposition"), Item 1 in Defendants' Documents, at 81–83; Deposition of Craig T. Burkert ("Burkert Deposition"), Item 6 in Volume 2, Appendices to Plaintiff's Motion for Summary Judgment, at 33, 57–58, 107.

Burkert spent the majority of his time during the second half of October 1994 at Southworth–Milton's Portland facility, where the general manager arranged for him to have his own office. Burkert Deposition at 116–17. Burkert and MCFA executed a letter of intent dated October 21, 1994 in which MCFA expressed its intention to enter into a dealership agreement with SSA, a corporation to be formed by Burkert and his wife. Second Burkert Aff. ¶ 10; Item 10 in Defendants' Documents; Plaintiff's Deposition at 313–14. SSA was formed and Burkert initially provided it with $560,000 in capital, to which he later added another $100,000. Second Burkert Aff. ¶¶ 13, 16. On or about October 31, 1994 SSA executed and delivered to MCFA a security agreement. *Id.* ¶ 14; Item 11 in Defendants' Documents. MCFA perfected the security interest granted by this agreement by filing certain UCC–1 financing statements with the Maine Secretary of State on or about November 21, 1994. Labrador Aff. ¶ 17.

On November 4, 1994 SSA and MCFA entered into a sales and service agreement. Second Burkert Aff. ¶ 17; Item 13 in Defendants' Documents. On November 7, 1994 SSA entered in a purchase and sale agreement with Southworth–Milton. Frohbieter Aff. ¶ 9 & Exhibit 2 thereto. SSA operated its Caterpillar forklift dealership out of the Southworth–Milton facility for the balance of 1994 and then relocated to a facility in Gorham, Maine. Frohbieter Aff. ¶ 10. All but two of the employees of Southworth–Milton at this location continued to work for SSA after the sale. Burkert Deposition at 118, 121–22. In addition to MCFA products, SSA acquired from Southworth–Milton and sold and/or serviced Crown, Clark and other brands of equipment; it also continued as a dealer for Kelley warehouse equipment. Affidavit [of Gregory E. King] ("First King Aff."), Item 4 in Volume 1, Appendices to Plaintiff's Motion for Summary Judgment, ¶ 7. SSA and MCFA also entered into a side letter agreement dated November 2, 1994 that was incorporated by its terms into the sales and service agreement. Labrador Aff. ¶ 22 & Exh. 13 thereto.

On March 6, 1995 SSA purchased the assets of H.O. Penn Machinery Company, Inc., a Caterpillar dealer in the Albany, New York area. Burkert Deposition at 176–78 & Item 19, Volume 2, Appendices to Plaintiff's Motion for Summary Judgment. On the same date, SSA executed a second sales and service agreement with MCFA covering the service area previously served by H.O. Penn. Labrador Aff. ¶ 6 & Exh. 4 thereto. SSA and MCFA also entered into a side letter agreement, dated May 15, 1995, in connection with this sales and service agreement. Labrador Aff. ¶ 22 & Exh. 14 thereto.

After SSA became a Caterpillar dealer, it purchased lift trucks, repair parts and other items from MCFA through purchase orders. First King Aff. ¶ 3; Item 11 in Defendants'/Counterclaim Plaintiffs' District of Maine Local Rule 26(c) List (Docket No. 24). SSA deposited all funds that it received from the sale of these items into its general operating account. Second Burkert Aff. ¶ 43. MCFA provided SSA with one or more sales programs. *Id.* ¶ 22. SSA also purchased from MCFA service manuals needed for the service, repair and maintenance of Caterpillar lift trucks, Affidavit [of George Taylor] ("Taylor Aff."), Item 3 in Volume 1, Appendices to Plaintiff's Motion for Summary Judgment, ¶ 4, and advertising and promotional materials, *id.* ¶ 6.

On November 3, 1994 SSA executed a promissory note to MCFA in the principal amount of $400,000. Labrador Aff. ¶ 2 & Exh. 1 thereto. By letter dated December 31, 1997 MCFA extended the maturity date of this note to December 31, 1998. *Id.* On February 23, 1998 SSA executed a promissory note to MCFA in the principal amount of $250,000 which had a maturity date of December 31, 1998. *Id.* ¶ 3 & Exh. 2 thereto. Neither note was paid in full on December 31, 1998, despite demand for payment by MCFA. *Id.* ¶ 4. The amount due on the 1994 note by its terms as of June 30, 1999 was $209,122.09 with interest accruing thereafter at the rate of $46.70 per day. *Id.* ¶ 2. The amount due on the 1998 note by its terms as of June 30, 1999 was $265,000 with interest accruing thereafter at the rate of $62.15 per day. *Id.* ¶ 3.

SSA issued purchase orders to MCFA for the purchase of lift trucks, parts and other items. *Id.* ¶ 7. When MCFA shipped goods to SSA in response to these purchase orders, it issued invoices for each shipment. *Id.* SSA has refused to pay sums that MCFA claims are due pursuant to certain such invoices. *Id.* ¶ 8; Amended Complaint (Docket No. 7) ¶ 37; Answer and Counterclaim (Docket No. 8) ¶ 37. In December 1998 MCFA informed SSA that it would only ship parts to SSA upon payment in advance and MCFA filled orders from SSA thereafter on this basis. Labrador Aff. ¶ 24.

On or about April 1, 1996 MCFA, Material Handling Associates, Inc. and Associates Commercial Corporation ("ACC") entered into an Intercreditor Agreement that established the relative priorities of their security interests in all of the assets of SSA. Affidavit of Craig T. Burkert in Support of Defendants'/Counterclaim Plaintiffs' Motion for Partial Summary Judgment Pursuant to Fed.R.Civ.P. 56(c) ("First Burkert Aff.") (Docket No. 25) ¶ 20; Labrador Aff. ¶ 17 & Exh. 10 thereto. The Intercreditor Agreement provided that ACC had a first priority security interest and MCFA a second priority inter-

est in all of SSA's assets with the exception of trucks and parts sold by MCFA or Material Handling Associates to SSA for which they had not been paid, and the proceeds of the sale of any such trucks or parts, in which MCFA had a first priority security interest and ACC a second priority interest. Intercreditor Agreement, Exhibit 10 to Labrador Aff., at 2, 3, 5–6. SSA agreed to be bound by the provisions of the Intercreditor Agreement pursuant to a document entitled Acknowledgement and Agreement. *Id.* at [15].

From September 17, 1998 through December 22, 1998 SSA received a total of $330,799.30 in proceeds from the sale of certain trucks and equipment in which MCFA had a first priority security interest under the Intercreditor Agreement. Labrador Aff. ¶ 9. These funds were not segregated and held in a separate account by SSA. *Id.* ¶ 14. After December 10, 1998 SSA received $75,317.86 from the sale of trucks in which MCFA had a first priority security interest under the Intercreditor Agreement and did not remit these funds to MCFA. *Id.* In letters dated December 10, December 17 and December 22, 1998 MCFA informed SSA that proceeds from the sales of goods in which MCFA had a first priority security interest were to be segregated from other funds received by SSA and not used to pay any creditors other than MCFA. Exh. 6, 8 & 9 to Labrador Aff. Before December 19, 1998 MCFA had allowed SSA to use proceeds from the sale of goods in which MCFA had a first priority security interest to pay other creditors. Plaintiff's Deposition at 237, 431, 436. Also by oral agreement, MCFA allowed SSA to make payment to lift trucks up to 90 days after the date of the invoice for each truck. Affidavit [of Gregory E. King], Item 4 in Appendix to Plaintiff/Counterclaim Defendant's Objection to Defendants/Counterclaim Plaintiffs' Motion for Partial Summary Judgment ("Second King. Aff."), ¶¶ 6–7.

On or about January 5, 1999 SSA terminated most of its employees. First Bur-

kert Aff. ¶ 29. The remaining employees were terminated before January 19, 1999. *Id.* On January 19, 1999 SSA, ACC, Burkert and his wife executed a Voluntary Surrender Agreement and Release pursuant to which SSA surrendered to ACC all of its assets. *Id.* ¶ 30; item 16 in Defendants' Documents. On January 27, 1999 MCFA sent to SSA notices of termination of the 1994 and 1995 sales and service agreements. Labrador Aff. ¶ 21 & Exhs. 11 & 12 thereto.

MCFA filed its initial complaint in this action on January 27, 1999.

## IV. Discussion

### A. Count I of the Amended Complaint

The plaintiff has moved for summary judgment on its Count I claim for money due from SSA. The defendants respond that they are entitled to summary judgment on this count, although this assertion is raised only in their opposition to the plaintiff's motion and not in their own motion for summary judgment, solely because the plaintiff has violated the Maine statutes governing the sale of business opportunities, 32 M.R.S.A. § 4691 *et seq.*, a position that serves as the basis for Count I of their counterclaim. As will be fully discussed below, the plaintiff is entitled to summary judgment on that count of the counterclaim. Even if that were not the case, however, the plaintiff is entitled to summary judgment on Count I of its amended complaint.

■ At issue in Count I are two promissory notes and several invoices for goods. The defendants do not dispute the plaintiff's arguments that Texas law applies to the interpretation of the notes, both of which include language specifying that Texas law shall govern construction of the note, Promissory Note dated November 3, 1994, Exh. 1 to Labrador Aff., ¶ 4; Promissory Note dated February 23, 1998, Exh. 2 to Labrador Aff., at 3; that in order to collect on a promissory note under Texas law, a holder need only establish that there is a note, that the plaintiff is the legal owner and holder of the note, that the defendant is the maker of the note, and that a certain balance is due and owing on the note, unless the maker establishes a defense, *Blankenship v. Robins,* 899 S.W.2d 236, 238 (Tex.App.1994); that SSA has failed to make payment on invoices for goods shipped to it by the plaintiff in response to SSA's purchase orders in the amount of $316,721.98, Labrador Aff. ¶ 8 & Exh. 5 thereto; and that demand has been made for payment by SSA and that payment has not been forthcoming. Motion of Plaintiff for Partial Summary Judgment and Incorporated Memorandum of Law ("Plaintiff's Memorandum") (Docket No. 20) at 3–5. The defendants rely only on the Maine statutes governing the sale of business opportunities, asserted as a defense. Defendants' Objection at 31–32.

■ The defendants rely on 32 M.R.S.A. § 4700(6), which provides remedies for violation of chapter 69–B of Title 32 of the Maine Revised Statutes Annotated, the chapter that governs the sale of business opportunities. Under that statute, the purchaser of a business opportunity may sue the seller who violates the chapter "in equity for rescission, for recovery of all money or other valuable consideration paid for the business opportunity and for actual damages, together with interest ..., reasonable attorney's fees and court costs." 32 M.R.S.A. § 4700(6). The defendants make the conclusory statement that "the notes and invoices for which MCFA seeks recovery ... are alleged obligations to pay money for the business opportunity which was unlawfully sold." Defendants' Objection at 32. The defendants suggest that the $400,000 loaned under the note dated November 3, 1994, which mentions no security or collateral and does not refer to the sales and service agreement between the parties that was dated one day later, was a payment *by SSA,* the recipient of the borrowed principal, for a business opportunity sold to it by the plaintiff, but that contention is wholly unsupported in the summary judgment record before the

court. Similarly, the note dated February 23, 1998, in the principal amount of $250,-000, cannot have constituted a payment by SSA to the plaintiff, particularly when it had acquired the business opportunity at issue, if such an opportunity as defined by 32 M.R.S.A. § 4691(3) was sold at all, more than three years before the note was executed. The invoices clearly seek payment for specific goods – "prime product" and replacement parts, Exh. 5 to Labrador Aff. – shipped years after SSA entered into the business of selling and servicing Caterpillar lift trucks; these invoices cannot be construed to seek payment for the sale of a business opportunity. SSA is not entitled to "recover" under 32 M.R.S.A. § 4700(6) money that was loaned to SSA and the value of goods that it purchased on credit and never paid for. *See, e.g., Kelly v. Kosuga,* 358 U.S. 516, 518, 79 S.Ct. 429, 3 L.Ed.2d 475 (1959) (plea of statutory violation no defense to action by seller to recover from purchaser agreed price of goods sold); *Prompt Elec. Supply Co. v. Allen–Bradley Co.,* 492 F.Supp. 344, 348 (E.D.N.Y.1980) (terminated distributorship agreement, which gave rise to buyer's claims of antitrust violations, "in no manner implicated" in seller's claim based on invoices for sale of goods). Even if SSA could rescind the two sales and service agreements between it and the plaintiff under the Maine statutes governing the sale of business opportunities, the statutory remedies available cannot be stretched to include retention of moneys obtained from the plaintiff under separate documents and agreements.

The plaintiff is entitled to summary judgment on Count I against SSA.

## B. Count II of the Amended Complaint

All parties seek summary judgment on Count II of the amended complaint, which alleges conversion by the defendants, specifically in the sale of collateral allegedly securing the plaintiff's loans and outstanding invoices without payment of the proceeds over to the plaintiff. The plaintiff concedes in its reply memorandum that disputed issues of material fact exist with respect to this claim with the exception of $75,317.86 received by SSA and Burkert after December 10, 1998. Reply of Plaintiff/Counterclaim Defendant in Support of Motion for Partial Summary Judgment ("Plaintiff's Reply Memorandum") (Docket No. 41) at 2; Plaintiff's Reply Statement of Material Facts (Docket No. 42) ¶¶ 56, 64. Accordingly, my consideration of the plaintiff's motion will be limited to this amount.

The plaintiff's claim is based on the October 31, 1994 Security Agreement, which provides in relevant part that

> [SSA] shall receive all proceeds from the sale or lease of inventory forming part of the collateral. Such proceeds shall be received by [SSA] under an express trust for the benefit of [MCFA] and shall not be commingles [sic] with other monies, assets or accounts of [SSA] until [SSA] pays to [MCFA] the indebtedness secured hereby, or that portion of the indebtedness which is due and payable hereunder with respect to the collateral. Upon payment of such indebtedness to [MCFA], the express trust hereby created shall be terminated and discharged.

Security Agreement, Exh. 7 to Labrador Aff., ¶ 11. The Security Agreement also provides:

> This agreement constitutes the entire agreement between the parties and may not be altered or amended except by a writing signed by all parties hereto. Waiver of any default hereunder shall not constitute waiver of any subsequent default. Any waiver or consent by [MCFA] of or to any default by [SSA] hereunder must be in writing specifically set forth.

*Id.* ¶ 15. The Security Agreement also states that "[t]he construction, validity and effect of this agreement shall be governed by the laws and public policy of the State of Texas." *Id.* ¶ 17. While all parties discuss the definition of conversion under Maine law, to the extent that the plaintiff

invokes the Security Agreement as the basis for this claim, it appears that this court must apply Texas law. None of the parties argues otherwise.

■ The plaintiff contends that the fact that SSA did not keep the money it obtained from the sale of MCFA's collateral separate from its other funds before paying MCFA on its invoices for those goods constitutes conversion. Plaintiff's Memorandum at 6–7. The plaintiff does not explain how this failure by SSA also constituted conversion by Burkert, except to note that he and his wife had "primary or sole check-writing authority" on SSA's accounts "[d]uring the September—December 1998 period." *Id.* at 7. The plaintiff also contends that Burkert informed MCFA in December 1998 that he intended to use the proceeds from the sales of MCFA's collateral to pay SSA's creditors other than MCFA, and specifically to pay creditors to whom he and his wife had extended personal guarantees (which they had not done with respect to SSA's security agreement with MCFA). *Id.* The defendants have properly disputed these assertions, Defendants' Opposing SMF ¶ 87, and they therefore cannot provide any basis for the plaintiff's motion for summary judgment. However, the defendants have not presented any argument concerning Burkert's liability on this count as distinct from that of SSA, and under Texas law an officer of a corporation is personally liable for any tort committed by the corporation through him. *Gardner Mach. Corp. v. U.C. Leasing, Inc.*, 561 S.W.2d 897, 899 (Tex.Civ.App.1978) (conversion); *Permian Petroleum Co. v. Barrow*, 484 S.W.2d 631, 634 (Tex.Civ.App.1972) (directors and officers who participated in corporation's con-

version by instigating, aiding, or abetting it liable as joint tortfeasors).[3] To the extent that SSA is liable for conversion, therefore, on this record Burkert is liable as well.

■ The defendants argue that MCFA consented to SSA's use of the proceeds from the sales of MCFA's collateral in SSA's business operations,[4] "rather than requiring SSA to segregate and turnover [sic] the same to MCFA," and that this consent "eliminates MCFA's alleged conversion claim." Defendants' Objection at 3. The defendants provide no evidence that such consent was ever written.[5] They also argue that the plaintiff's December 10 letter stating that "effective immediately, payment for all machines sold to Superior will be due upon receipt of the sale proceeds, but in no event later than 30 days from our invoice date," Exh. 6 to Labrador Aff., could not serve to alter the 90–day term of invoices already delivered and could not serve to invoke the express terms of the Security Agreement requiring segregation of funds because there was no consideration for this "unilateral effort … to change the terms upon which all MCFA products had been sold to SSA." Defendants' Objection at 5–6. However, the citations to the record offered by the defendants in support of the latter portion of this argument, Defendants'/Counterclaim Plaintiffs' Statement of Material Facts as to Which There is No Genuine Issue of Material Fact to Be Tried ("Defendants' SMF") (Docket No. 23) ¶ 37 and the First Burkert Aff. ¶ 2, in fact provide no evidence that there was no consideration for the change, and that basis for the argu-

3. Maine case law is silent on this point.

4. The plaintiff denies this factual assertion only as to the period on or after December 10, 1998. Plaintiff's Reply Statement of Material Facts (Docket No. 42) ¶ 64.

5. The defendants also argue that the credit terms on MCFA's invoices, allowing SSA 90 days in which to pay, regardless of the date

upon which SSA received payment from its customers, "are entirely inconsistent with the alleged requirement that SSA segregate the proceeds of sale of Caterpillar brand machines, equipment and parts and pay such proceeds over to MCFA." Defendants' Objection at 4. That may be, but such an inconsistency is far from a written waiver of the terms of the Security Agreement.

ment accordingly will not be considered further.

■ This argument mischaracterizes the December 10 letter, which made clear the fact that MCFA was not attempting to alter the terms of invoices already in effect ("Due dates for those invoices you currently owe us will not be extended."). Exh. 6 to Labrador Aff. In any event, the 90–day terms of any such invoices have by now long since expired. The defendants provide no citations to authority to support their argument that an oral waiver of a term of a written agreement [6] that requires all waivers to be in writing may not be revoked.[7] My own research has unearthed no such authority. *Cf. Interstate,* 355 A.2d at 919 (where "[t]he record shows conclusively that the plaintiff not only had no intention to abandon its rights under the agreement and suspended service until [a certain date] only as an accommodation to the defendant, but that the defendant also understood that the agreement was binding and would be reinstated [on that date]," waiver can only be temporary). For sales of MCFA collateral provided to SSA after December 10, 1998 therefore, SSA was required to segregate its proceeds and pay MCFA before using the funds for any other purpose. Accordingly, SSA's motion for summary judgment on Count II must be denied.

■ Failure to comply with the terms of the security agreement would not necessarily constitute conversion under Texas law, however.

> An action for conversion of money will lie where the money is (1) delivered for safekeeping; (2) intended to be kept segregated; (3) substantially in the form in which it is received or an intact fund; and (4) not the subject of a title claim by the keeper.

*Phippen v. Deere & Co.,* 965 S.W.2d 713, 724 (Tex.App.1998). The plaintiff has not established in this record the undisputed material facts necessary to prove the first and third elements of this claim under Texas law.[8] As a result, its motion for summary judgment on Count II must also be denied.

### C. Counts III–V of the Amended Complaint

The defendants seek summary judgment on each of these counts, two of which are asserted only against defendant Burkert.

■ *1. Count III.* In Count III, the plaintiff seeks to pierce the corporate veil so that Burkert will be held liable for "all of the obligations of SSA to MCFA and for all of the claims of MCFA against SSA set forth in this First Amended Complaint." Amended Complaint at 9. Piercing the corporate veil is an equitable remedy, *Matthews Const. Co., Inc. v. Rosen,* 796 S.W.2d 692, 693 (Tex.1990); *Johnson v. Exclusive*

---

**6.** Oral modification of the payment terms of a written contract is possible under both Texas and Maine law, *Troutman v. Interstate Promotional Printing Co.,* 717 S.W.2d 428, 429 (Tex.App.1986); *Interstate Indus. Uniform Rental Service, Inc. v. Couri Pontiac, Inc.,* 355 A.2d 913, 919 (Me.1976), may be shown by circumstances or course of dealing, *Carpet Servs., Inc. v. George A. Fuller Co. of Texas,* 802 S.W.2d 343, 346 (Tex.App.1990); *Interstate,* 355 A.2d at 919, and under Texas law is possible even when the written contract provides that modification is only to be made in writing, *Robbins v. Warren,* 782 S.W.2d 509, 512 (Tex.App.1989).

**7.** Indeed, the defendants, who base this argument in part on the alleged absence of consid-

eration for the "revocation," offer no evidence that SSA provided any consideration for the plaintiff's alleged agreement to modify the terms of the security agreement in the first place. *See Palmer v. Solon Lumber Co.,* 119 Me. 100, 101, 109 A. 385 (1920) ("No question is raised as to the consideration for the defendant's new promise" modifying the terms of a written contract.).

**8.** Under Maine law, a party claiming conversion of money must prove that "it had a property interest in the money, the right to its possession at the time of the alleged conversion and, if [the defendant] acquired possession rightfully, a demand and a refusal by [the defendant] to surrender." *Keyes Fibre Co. v. Lamarre,* 617 A.2d 213, 214 (Me.1992).

*Properties Unlimited*, 720 A.2d 568, 571 (Me.1998), that allows a court to disregard the corporate entity and award relief against an individual on claims that might otherwise be limited to relief against the corporation.[9] It is not a cause of action in itself. *Rosen*, 796 S.W.2d at 693 n. 1. If summary judgment were entered on Count III of the complaint in favor of either party, no damages or other relief would necessarily follow. The plaintiff must make a case for recovery against SSA before any consideration may be given to making Burkert personally liable for that recovery as well. Ordinarily, Count III would be subject to dismissal as surplusage. However, one count of the amended complaint is asserted only against SSA. Amended Complaint, Count I at 7.

■ The parties cite cases involving the common law of Maine, Texas, West Virginia, Georgia, Missouri and Michigan. For the reasons set forth in my discussion of Count I above, it appears that Texas law should control on this issue. If Count I sounds in tort, Texas law provides that "[i]t is not necessary that the 'corporate veil' be pierced in order to impose personal liability, as long as it is shown the corporate officer knowingly participated in the wrongdoing." *Kollision King, Inc. v. Calderon*, 968 S.W.2d 20, 25 (Tex.App.1998). However, Count I, which seeks payment on notes and invoices, sounds in contract. Attempts to pierce the corporate veil on contract claims are now governed by statute in Texas.

> A holder of shares ..., or any affiliate thereof or of the corporation, shall be under no obligation to the corporation or to its obligees with respect to:
>
> \* \* \* \* \* \*

(2) any contractual obligation of the corporation or any matter relating to or arising from the obligation on the basis that the holder ... or affiliate is or was the alter ego of the corporation, or on the basis of actual fraud or constructive fraud, a sham to perpetrate a fraud, or other similar theory, unless the obligee demonstrates that the holder ... or affiliate caused the corporation to be used for the purpose of perpetrating and did perpetrate an actual fraud on the obligee primarily for the direct personal benefit of the holder ... or affiliate; or

(3) any obligation of the corporation on the basis of the failure of the corporation to observe any corporate formality.

Tex. Bus. Corp. Act Ann. art. 2.21(A). Both the plaintiff and Burkert have submitted rather sketchy arguments and supporting factual statements on this issue. However, the plaintiff has submitted no evidence that Burkert fraudulently induced it to issue the two promissory notes or to deliver goods to SSA under the invoices that allegedly remain unpaid. The only evidence of possible fraud submitted by the plaintiff concerns the alleged sale of the collateral for the loans and the transfer of the proceeds of these sales to parties other than the plaintiff, which is addressed by Count IV of the amended complaint. This evidence would not support a finding of actual fraud by Burkert in connection with the transactions at issue in Count I, and he is accordingly entitled to summary judgment on any veil-piercing claim related to Count I.

■ *2. Count IV.* This count alleges that both defendants engaged in the fraudulent transfer of funds generated by the sale of collateral identified by the In-

---

9. Because it is impossible to tell from the complaint and the summary judgment materials submitted by the plaintiff whether any "obligations of SSA to MCFA" other than those described in Counts I, II, and IV exist, any judgment holding Burkert liable for such obligations would be advisory at best. The plaintiff has not requested declaratory relief in this regard and it is unlikely that declaratory relief would be available on the record presented. The defendants are entitled to summary judgment on that portion of Count III that seeks to impose upon Burkert individual liability for any obligations other than those specifically set forth in the complaint, all of which are discussed elsewhere in this recommended decision.

tercreditor Agreement as MCFA's first priority collateral for its loans to SSA, in violation of the Maine Uniform Fraudulent Transfer Act ("UFTA") "and/or other applicable law." Amended Complaint at 10. The defendants make no reference to any "other applicable law" in their submissions to the court in connection with the pending motions, nor is any such law mentioned by the plaintiff. Any such claim is therefore not before the court. The defendants contend that there is no evidence that any of the transfers identified by the plaintiff were for less than reasonably equivalent value or were made with actual intent to hinder, delay or defraud the plaintiff and that neither defendant can be held liable for any fraudulent transfer because neither was the transferee in any cited instance. Defendants'/Counterclaim Plaintiffs' Motion for Partial Summary Judgment Pursuant to Fed.R.Civ.P. 56(c) and Incorporated Memorandum of Law ("Defendants' Memorandum") (Docket No. 22) at 28. The plaintiff responds that it need not prove reasonably equivalent value so long as it shows that the transfers at issue were intended to hinder, delay or defraud the plaintiff and that damages are available against a transferor under the UFTA. In their reply brief, the defendants argue for the first time that the transactions at issue were not transfers within the meaning of the UFTA. Reply Memorandum to Objection of Plaintiff/Counterclaim Defendant to Defendants'/Counterclaim Plaintiffs' Motion for Partial Summary Judgment ("Defendants' Reply") (Docket No. 37) at 3–5.

The plaintiff understandably objects to the defendants' resort to a new argument in their reply memorandum and has moved to strike that section of the reply memorandum. Plaintiff/Counterclaim Defendant's Motion to Strike, etc. (Docket No. 43) at 2. The defendants respond that the plaintiff "opened the door" to an argument concerning the "transfer of assets" by using that term in their objection to the

motion for summary judgment and by citing a case in which the dissenting opinion "makes the very argument advanced by Defendants." Memorandum of Law in Opposition to Plaintiff/Counterclaim Defendant's Motion to Strike, etc. (Docket No. 44) at [1], 3. Neither of these arguments is worthy of lengthy consideration. The plaintiff could hardly have discussed a claim under the UFTA without using the words "transfer of assets," and it clearly did not cite the case at issue for the proposition that the transactions in dispute in the instant case were not transfers under the UFTA. In this court, reply memoranda are to be "strictly confined to replying to new matter raised in the objection or opposing memorandum." Local Rule 7(c). Section B of the defendants' reply memorandum violates this rule. Issues raised for the first time in reply memoranda will not be considered by this court. *In re One Bancorp Securities Litigation*, 134 F.R.D. 4, 10 n. 5 (D.Me.1991). The motion to strike section B of the defendants' reply memorandum, Docket No. 37, is granted.

 Both of the plaintiff's substantive arguments are also correct. A plaintiff may establish the existence of a fraudulent transfer by providing clear and convincing evidence that a defendant intended to hinder, delay or defraud the plaintiff, so long as the plaintiff was a creditor of the defendant at the relevant time. 14 M.R.S.A. § 3575(1)(A); *FDIC v. Proia*, 663 A.2d 1252, 1254 (Me.1995). Evidence that the transfers at issue were not made for reasonably equivalent value is an alternative way to establish a fraudulent transfer. 14 M.R.S.A. §§ 3575(1)(B); 3576(1). Neither approach is exclusive and proof of both is not required. The defendants' brief and reply memorandum address only the questions of reasonably equivalent value and whether the transactions at issue were transfers at all. There is only a glancing reference to their alleged intent to hinder, delay or defraud the plaintiff.[10] Defen-

---

10. At another point in their brief, addressing

Count V, the defendants argue that Burkert's

dants' Memorandum at 28. That conclusory reference is not sufficient to establish either the absence of disputed material facts on this point or their entitlement to summary judgment as a matter of law.

 With respect to the second substantive argument, a plaintiff may recover from the transferor for a fraudulent transfer. 14 M.R.S.A. § 3578(1)(C)(3); *see Handy Boat Serv., Inc. v. Professional Servs., Inc.*, 711 A.2d 1306, 1309–10 (Me. 1998); *Proia*, 663 A.2d at 1253, 1255 (money damages awarded against transferor).

The defendants are not entitled to summary judgment on Count IV of the complaint on the basis of the arguments properly before the court.

*3. Count V.* Defendant Burkert is charged in this count with breach of a fiduciary duty to the plaintiff in its capacity as a creditor of SSA. Amended Complaint ¶¶ 55–61. Without citation to any authority, the defendants argue that Burkert is entitled to summary judgment because the undisputed facts show that he made no fraudulent transfers; he satisfied the claims of creditors other than the plaintiff because he had a good-faith belief that SSA was required to do so; the Voluntary Surrender Agreement and Release executed January 19, 1999 among SSA, Burkert and his wife, ACC and Associates Leasing, Inc. provides that the transferees of SSA's remaining assets (ACC and Associates Leasing, Inc.) may choose or be required to pay over to the plaintiff certain monies relating to the plaintiff's collateral under the Intercreditor Agreement, in which case SSA and the Burkerts will remain liable to ACC and Associates Leas-

ing, Inc. in an amount up to $100,000, Voluntary Surrender Agreement and Release, Item No. 23 in Defendants' Documents, ¶ 7; and the plaintiff has a lien on its collateral under the Intercreditor Agreement. Defendants' Memorandum at 22–27.

In response, the plaintiff states that Count V invokes the "corporate trust fund doctrine," pursuant to which a corporation's officers or directors owe a fiduciary duty to the corporation's creditors after the corporation becomes insolvent. Objection of Plaintiff/Counterclaim Defendant to Defendants/Counterclaim Plaintiffs' Motion for Partial Summary Judgment (Docket No. 29) at 23–24. It points out that the parties dispute the date upon which SSA became insolvent and argues that the fraudulent conduct alleged in Count IV, if proved, would constitute a breach of this duty. *Id.* at 24–25. The defendants' only argument in reply is that Burkert is entitled to summary judgment on Count V because the defendants are entitled to summary judgment on Counts II and IV. Defendants' Reply at 5–6. I have recommended that the court deny summary judgment on both of those counts, and the defendants' derivative argument therefore will not be considered further.

 The plaintiff cites *United States v. Van Diviner*, 822 F.2d 960, 965 (10th Cir.1987), for a definition of the corporate trust fund doctrine. In that case, the court applied federal common law, *id.* at 963, but in most cases the doctrine is a creature of state law, *e.g.*, *Askanase v. Fatjo*, 130 F.3d 657, 665 (5th Cir.1997) (Texas law). Under Maine law, "[t]he as-

statement in his first affidavit that neither he nor SSA intended to hinder, delay or defraud any creditors, First Burkert Aff. ¶ 45, is "undisputed" and sufficient to "preclude any finding by this Court of a fraudulent transfer." Defendants' Memorandum at 24. To the contrary, this conclusory and self-serving statement is vigorously disputed by the plaintiff, Plaintiff/Counterclaim Defendant's Opposing Statement of Material Facts (Docket No. 30) ¶ 66, and it is accordingly far from

sufficient to support an entry of summary judgment. The defendants also contend that the plaintiff "admits to having no evidence of any transfers of SSA's assets ... with any intent to hinder, delay and defraud." Defendants' Memorandum at 24. The citations to the summary judgment record provided by the defendants in this regard, Defendants' SMF ¶¶ 53, 55, do not support their factual contention.

sets of an insolvent corporation are a trust fund for its creditors." *Symonds v. Lewis,* 94 Me. 501, 505, 48 A. 121 (1901). "The directors in such case are not strictly trustees for the general creditors ... but they owe them a duty, which is inconsistent with the taking of a security for prior indebtedness to their detriment." *Id.* While the authority cited by the plaintiff does not support its argument that any fraudulent transfer of SSA assets by Burkert would be a breach of his fiduciary duty to SSA's creditors, including the plaintiff, the plaintiff has provided evidence in the summary judgment record to support its claim that certain actions by Burkert violated that duty by diverting SSA assets to pay other creditors, the payment of which benefitted Burkert because he had given a personal guarantee of SSA's debts to those creditors, but not to the plaintiff. It is also clear that the plaintiff contends that SSA has failed to pay it money due not only from the sale of the collateral identified in the Intercreditor Agreement, but also for lift trucks and other materials not listed as collateral in that agreement. It is similarly apparent from the summary judgment record that the parties disagree on the date on which SSA became insolvent. *Compare* Deposition of Mitsubishi Caterpillar Forklift America, Inc. by R. Steven Thing, excerpts attached as Item 10 to Appendix to Plaintiff/Counterclaim Defendant's Objection to Defendants/Counterclaim Plaintiffs' Motion for Partial Summary Judgment, at 54 (SSA was insolvent as of July 31, 1998), *with* Affidavit of Mark G. Filler in Support of Objection of Defendants/Counterclaim Plaintiffs to Motion of Plaintiff for Partial Summary Judgment ("Second Filler Aff.") (Docket No. 35), ¶ 5, Exh A. thereto ¶ 2 &

Exh. B thereto (SSA not insolvent as of July 31, 1998).[11]

■ These circumstances make obvious the insufficiency of Burkert's latter two arguments in support of summary judgment in his favor. A lien on collateral subject to the Intercreditor Agreement would not provide full relief for the plaintiff's claims under Count V. The fact that the third-party creditors to which SSA and Burkert conveyed all or most of SSA's remaining assets may have to pay some of the value of those assets over to the plaintiff as a result of court action, or may choose to do so voluntarily, and may then recover up to $100,000 from SSA and Burkert, does not mean that the plaintiff has any assurance of receiving all of the damages it seeks and may be entitled to in Count V. More important, the fact that the plaintiff may recover some of its damages elsewhere cannot mean, as a matter of law, that Burkert did not violate a fiduciary duty to the plaintiff. At most, these two arguments affect only the amount of damages that the plaintiff might recover from Burkert.

Burkert's first two arguments are also insufficient. If he is not entitled to summary judgment on Count IV, alleging fraudulent transfers, as I have recommended, he is not entitled to summary judgment on Count V on the ground that his lack of liability for fraudulent transfers insulates him from fiduciary duty liability. He cites no authority for his argument that his asserted good-faith belief that SSA was required to present all or most of its remaining assets to creditors other than the plaintiff bars any claim for fiduciary-duty liability. Good faith does appear to be a defense to a claim of breach of fiduciary duty in certain circumstances,

11. The Filler affidavit refers to "[a] true and correct copy" of his Expert Report as being attached to his affidavit. Second Filler Aff. ¶ 5. However, no report is attached to the affidavit. The first attachment is a copy of the Defendants' Designation of Expert Witness, with an extensive statement of the opinions that may be offered by Filler at trial.

Ordinarily, a document designating an expert witness is not of evidentiary quality and not suitable as a factual source for purposes of summary judgment. I nonetheless rely on that document here because Filler appears to have adopted it as his own statement by the terms of his affidavit.

*e.g., Rollins v. Metropolitan Life Ins. Co.,* 912 F.2d 911, 914–15 (7th Cir.1990); *Adamczyk v. Lever Bros. Co.,* 991 F.Supp. 931, 939 n. 5 (N.D.Ill.1997). Burkert's self-serving claim of good faith, First Burkert Aff. ¶ 30, is not disputed by the plaintiffs, Defendants' SMF ¶ 45; Plaintiff/Counterclaim Defendant's Opposing Statement of Material Facts (Docket No. 30) ¶ 45. However, that assertion goes only to the assets transferred to ACC and Associates Leasing, Inc., while the plaintiff's complaint includes other failures by Burkert to direct SSA to pay moneys due to the plaintiff, and in any event neither party to a summary judgment motion may rely on conclusory allegations, *Magee v. United States,* 121 F.3d 1, 3 (1st Cir.1997), particularly where intent is at issue, *see Judge v. Lowell,* 160 F.3d 67, 72 (1st Cir. 1998) (discussing pleading requirements).

Accordingly, defendant Burkert is not entitled to summary judgment on Count V of the amended complaint.

### D. Count I of the Counterclaim

The plaintiff seeks summary judgment on this count, which alleges a violation of 32 M.R.S.A. §§ 4691–4700–B, a set of statutes governing the sale of business opportunities ("the Act"). The defendants allege in this count that the 1994 and 1995 Sales and Service Agreements record the plaintiff's sales of business opportunities to SSA within the scope of the Act and that violations of the Act by the plaintiff in connection with those sales entitle them to monetary and equitable relief under the Act. Counterclaim (Docket No. 8) ¶¶ 33–48. The plaintiff contends that the Act does not apply to these transactions because the agreements specify that Ohio law controls, 1994 Agreement ¶ 29, 1995 Agreement ¶ 29;[12] that the Act does not apply to these transactions by its own terms; and

that, even if the Act applies, the defendants are not entitled to damages. Plaintiff's Memorandum at 9–21. The defendants respond that the claim raised in Count I is personal to Burkert and arises out of the letter of intent between him and the plaintiff which preceded the execution of the 1994 and 1995 Agreements and does not include a choice-of-law provision; that the claim raised in Count I does not arise under the 1994 and 1995 Agreements; that the choice-of-law provision in the agreements is unenforceable; that the plaintiff sold them a business opportunity as that term is defined in the Maine Act; and that they are entitled to all sums sought as damages. Defendants' Objection at 7–30. In its reply, the plaintiff, in addition to repeating its earlier arguments, contends that the letter of intent has been superceded by the 1994 Agreement and no longer has independent legal significance, and that Burkert, who carried out his own "due diligence" before entering into the Agreements, is not among the class of those intended to be protected by the Act. Plaintiff's Reply at 3–6.

■ *1. Applicable law.* Burkert's assertions that Count I of the counterclaim is based on the letter of intent signed by him and the plaintiff, and that Count I does not arise under the 1994 and 1995 Agreements, strain credulity. The letter of intent is not mentioned in the counterclaim, and Count I of the counterclaim refers to the alleged sale of a business opportunity as being "pursuant to" the 1994 and 1995 Agreements, Counterclaim ¶¶ 34; to the Agreements as "business opportunity agreements," *id.* ¶ 39; and to the Agreements as involving the sale of a business opportunity, *id.* ¶¶ 41, 43, 47–48. In any event, the 1994 Agreement contains an integration clause[13] and the letter of intent

---

**12.** Both agreements contain the following identical language in paragraph 29: "This agreement shall be governed and construed in accordance with the laws of the State of Ohio, U.S.A. (including specifically the Uniform Commercial Code of Ohio) applicable to contracts made in and to be performed in Ohio,

without regard of [sic] conflict of laws principals [sic]."

**13.** Specifically, the agreement provides: "This agreement supersedes any prior oral or written agreement relating to sales and servicing of Products." 1994 Agreement ¶ 26(a).

accordingly may not provide the basis for any legal action.[14] *TRINOVA Corp. v. Pilkington Bros., P.L.C.,* 70 Ohio St.3d 271, 638 N.E.2d 572, 575 (Ohio 1994); *Everett v. Rand,* 152 Me. 405, 410, 131 A.2d 205 (1957).

There is no evidence in the summary judgment record to substantiate a claim that the plaintiff sold anything to Burkert. Even the letter of intent expresses the intention of the plaintiff to contract with SSA in a sales and service agreement; nothing is sold by the terms of the letter itself. Letter from R.L. Wuench to Martha Burkert and Craig Burkert dated October 21, 1994, Item 10 in Volume 2 of Appendices to Plaintiff's Motion for Summary Judgment, at 1. Accordingly, the plaintiff is entitled to summary judgment on Count I of the counterclaim insofar as it is asserted by Burkert, regardless of the applicable law.

■■■■ Similarly, the defendants offer no response to the plaintiff's argument that the Maine Act may not be applied to the 1995 Agreement, which concerns a dealership in New York. A state may not apply its statutes regulating business to commerce that takes place outside its boundaries. *Healy v. Beer Institute,* 491 U.S. 324, 336–37, 109 S.Ct. 2491, 105 L.Ed.2d 275 (1989). Accordingly, the defendants may not raise a claim under the Maine Act with respect to the 1995 Agreement and the events surrounding it and the plaintiff is entitled to summary judgment on Count I of the counterclaim to the extent that it is based on the 1995 Agreement or the events surrounding it.

■■■■ Maine courts will enforce a contractual choice of law provision unless either (a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the par-

ties' choice or (b) the application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue.

*Schroeder v. Rynel, Ltd.,* 720 A.2d 1164, 1166 (Me.1998) (internal quotation marks and citation omitted). This rule is to be followed by the federal court sitting in Maine. *See Ferrofluidics Corp. v. Advanced Vacuum Components, Inc.,* 968 F.2d 1463, 1467 (1st Cir.1992). The defendants discuss both prongs of this test at length, but consideration of the first is sufficient. The summary judgment record is devoid of evidence demonstrating that Ohio has any relationship, substantial or otherwise, to either of the parties or the transaction at issue, or any other reasonable basis for the choice of Ohio law in the 1994 Agreement. Accordingly, Maine law will apply to this claim.

*2. Application of Maine law.* Whether the claim asserted in Count I of the counterclaim arises from the 1994 Agreement or not, the defendants have not submitted evidence that will prevent the entry of summary judgment for the plaintiff on this court.

The Act provides that

[a]ny person who violates this chapter or any rule or order under this chapter, is liable to the purchaser who may sue either at law or in equity for rescission, for recovery of all money or other valuable consideration paid for the business opportunity and for actual damages, together with interest at the legal rate from the date of sale, reasonable attorney's fees and court costs.

32 M.R.S.A. § 4700(6). The Act (Chapter 69–B of Title 32) requires the seller of a business opportunity to provide the buyer with a disclosure statement with specified contents at a specific time, 32 M.R.S.A.

---

**14.** The letter of intent, Item 10 in Volume 2 of Appendices to Plaintiff's Motion for Summary Judgment, while addressed to Burkert and his wife, expresses the intent of the plaintiff to enter into a sales and service agreement with SSA, which was at that time not yet incorporated.

§§ 4692, 4693, to obtain a surety bond or escrow account in an amount not less than $30,000 unless it has a permanent place of business in Maine, 32 M.R.S.A. § 4695, and to register with the state securities administrator before selling or offering to sell business opportunities in the state, 32 M.R.S.A. § 4696. The plaintiff does not contend that it did any of these things. It is unlawful for any seller to fail to comply with the chapter's provisions, to make representations concerning the business opportunity in the absence of material constituting a reasonable basis for the representation which must also be made available to the purchaser, to use a commercial symbol of a business which the seller does not control unless he informs prospective purchasers that the owner of the symbol is not involved in the sale, or to make "any false, misleading or deceptive representations concerning the business opportunity." 32 M.R.S.A. § 4699.

The Act defines a seller as

a person who sells, leases or distributes or offers to sell, lease or distribute, advertises or undertakes any other act relating to the promotion of business opportunities.

32 M.R.S.A. § 4691(6). A purchaser is defined as "a person who purchases, leases or communicates with a seller concerning the purchase or lease of a business opportunity." *Id.* (5). The Act defines a business opportunity as follows:

A. The sale, lease or distribution of any services, products, equipment, supplies, goods or commodities . . . that are sold, leased or distributed by the seller or an affiliated person to the purchaser for the purpose of enabling the purchaser to start a business, for which the purchaser is required to pay an amount that exceeds $250 either as a single payment or in multiple payments during any consecutive 6–month period and in which the seller represents that:

(1) The seller or an affiliated person will provide locations or assist the purchaser in finding locations for the use or operation of vending machines, racks, display cases or other similar devices or currency-operated amusement machines or devices, on premises neither owned nor leased by the purchaser or seller;

(2) The seller or an affiliated person will purchase any or all products made, produced, fabricated, grown, bred or modified by the purchaser using in whole or in part, the supplies, services or chattels sold to the purchaser;

(3) The seller guarantees that the purchaser will derive income from the business opportunity that exceeds the price paid for the business opportunity;

(4) If the purchaser is unsatisfied with the business opportunity, the seller will refund all or any part of the price paid for the business opportunity, or repurchase any of the products, equipment, supplies or chattels supplied by the seller; or

(5) The seller or an affiliated person will provide a sales program or marketing program except that this subsection does not apply to a marketing program provided in conjunction with the licensing of a federally registered trademark or service mark; and

(B) "Business opportunity" does not include the sale of an ongoing business when the owner of that business sells and intends to sell only that one business opportunity; nor does it include the not-for-profit sale of sales demonstration equipment, materials or samples, for a total price of $500 or less.

32 M.R.S.A. § 4691(3). The plaintiff contends that it did not sell either of the defendants a business opportunity as that term is defined in the Act. The defendants concede that only subsection (A)(5) of the definition applies in this case, if the definition is applicable at all. The parties apparently do not dispute the fact that the plaintiff represented that it would provide

SSA with a sales or marketing program and in fact did so. Defendants' SMF ¶¶ 19–20; Plaintiff/Counterclaim Defendant's Opposing Statement of Material Facts (Docket No. 30) ¶¶ 19–20.

In this case, there was an ongoing Caterpillar lift truck business in Portland, Maine that SSA purchased, but it made that purchase from Southworth–Milton, not the plaintiff. The defendants contend that the plaintiff sold them a business opportunity "[p]ursuant to the Letter of Intent and the 1994 Agreement." Defendants' Objection at 23. There is no evidence in the summary judgment record that either defendant paid the plaintiff for either the letter of intent or the 1994 Agreement. The defendants contend that whatever the plaintiff sold them was for the purpose of enabling them to start a business because neither of them had been involved in the sale of lift trucks before. *Id.* They identify all of the Caterpillar brand machinery, equipment and parts sold to SSA as the products sold by the plaintiff for the purpose of enabling them to start the business.[15] *Id.* In their own motion for summary judgment on this count, the defendants suggest that the $250 statutory threshold may also be met by a term in the letter of intent which "obligated Mr. Burkert to cause Superior to spend more than $250 within such 6–month period to purchase new counterbalanced short-term rental units in order to maintain/grow SSA's rental fleet." Defendants' Memorandum at 16.

First, the argument that the plaintiff sold either of the defendants a business opportunity as that term is defined in the

Act in this case merely because they had not been involved in this specific business before would, if adopted, eviscerate the exception established by section 4691(3)(B) for the sale of an ongoing business. The owner of an ongoing business could certainly sell it to someone who had not been involved in that business before. The buyer's experience or lack thereof cannot be determinative of whether a sale is made for the purpose of enabling the purchaser to start a business, within the meaning of the statutory definition.

Next, the sales by the plaintiff to SSA of the very products that SSA, a Caterpillar dealer, was in the business of selling at retail, over the full term of SSA's business operations, cannot possibly be considered sales for the purpose of enabling SSA to *start* a business. Only if SSA had no inventory at the time it took over the dealership could the sale of product to SSA by the plaintiff be considered a sale made for the purpose of enabling SSA to start a business. The summary judgment record is devoid of any evidence that such was the case. Indeed, the purchase and sale agreement between Southworth–Milton and SSA indicates that at least 14 items of "new inventory" and 18 items of "used inventory" changed hands. Purchase and Sale Agreement, Exh. 2 to Frohbieter Aff. at 1 & Exh. A thereto.

Finally, the defendants offer no evidence that SSA actually did pay more than $250 to the plaintiff in the first 6 months of its existence as a dealership for the rental inventory they claim it was required by the letter of intent to purchase.[16] The failure to do so not only deprives them of any opportunity for the entry of summary

---

**15.** In a later section of their objection to the plaintiff's motion for summary judgment on this count, dealing with the damages available, an issue that I do not reach, the defendants contend that the $560,000 in capital that Burkert invested in SSA "is what Defendants initially paid to MCFA for the business opportunity sold to them by MCFA." Defendants' Objection at 30. That assertion is absurd on its face.

**16.** The defendants' statement that "[i]t would have been impossible for Mr. Burkert to comply with his obligations under Paragraph 2 of Addendum B to the Letter of Intent without causing SSA to spend at least $250 either as a single payment or in multiple payments during the first six months of its operations under the 1994 Agreement," Defendants' SMF ¶ 18, is quite different from evidence that SSA in fact made any such payment or payments.

judgment in their favor on Count I of the counterclaim on this basis, it also causes me to recommend the entry of summary judgment for the plaintiff under the circumstances of this case. The defendants offer no other factual basis to support a finding that the plaintiff sold either of them a business opportunity within the meaning of the Act. Nothing in the only reported case in which the Maine Law Court addressed the Act leads me to question my findings on this issue. *Fraser v. A Superior Snack, Inc.,* 704 A.2d 395 (Me. 1998).

My conclusion that there is no evidence in the summary judgment record to support a claim that the plaintiff sold the defendants, or either one of them, a business opportunity makes it unnecessary to address the parties' other arguments on Count I of the counterclaim. The plaintiff is entitled to summary judgment on this court.

### E. Count II of the Counterclaim

The defendants seek summary judgment on this count, which alleges a violation of the Maine Unfair Trade Practices Act ("UTPA"), 5 M.R.S.A. § 205–A *et seq.,* solely on the ground that a violation of the Maine statutes governing the sale of a business opportunity is *per se* a violation of the UTPA, citing 32 M.R.S.A. § 4700(1). Defendants' Memorandum at 18; Defendants' Objection at 32–33. My conclusion that the plaintiff is entitled to summary judgment on the defendants' claim under the business opportunity statutes necessarily means that in my view the defendants cannot recover judgment on Count II on the only ground that they present.[17]

### F. Count IV of the Counterclaim

█ In this count the defendants claim that the plaintiff sold them a franchise through the 1995 Agreement in violation of

New York General Business Law §§ 683 and 687. The plaintiff contends that it is entitled to summary judgment on this count by virtue of the applicable statute of limitations and, in the alternative, because SSA was not required to pay a franchise fee as that term is defined in the New York statute. The defendants appear to concede that their claim is time-barred under the New York statute, but assert in conclusory fashion that the plaintiff is not entitled to summary judgment on this count because the defendants may nonetheless assert the claim as an affirmative defense "under the doctrine of recoupment." Defendants' Objection at 35. An affirmative claim made by way of counterclaim is, of course, very distinct from an affirmative defense.

Section 691(4) of New York's general business law provides: "An action shall not be maintained to enforce a liability created under this section unless brought before the expiration of three years after the act or transaction constituting the violation." N.Y. Gen. Bus. Law § 691(4) (McKinney 1999). This section is the one that creates the cause of action set forth in Count IV of the counterclaim. *Id.* (1). The counterclaim alleges that the 1995 Agreement was executed in March 1995. Counterclaim ¶ 28. The counterclaim was filed on February 25, 1999, more than three years later. The claim is barred by the statute of limitations.

The defendants cite two cases in support of their argument that summary judgment on this claim should be denied because the claim may be raised as an affirmative defense seeking recoupment, *Reiter v. Cooper,* 507 U.S. 258, 113 S.Ct. 1213, 122 L.Ed.2d 604 (1993), and *Machias Sav. Bank v. Ramsdell,* 689 A.2d 595, 599 (Me. 1997). Neither supports the denial of

---

**17.** I note that, except in cases where a separate statute enacted by the Maine Legislature has established a *per se* violation, the UTPA is limited to recovery by individuals who have purchased or leased goods, services or property primarily for personal, family or household purposes. 5 M.R.S.A. § 213(1). Neither defendants' purchases from the plaintiff could reasonably be construed to fit within this limitation. *See C–B Kenworth, Inc. v. General Motors Corp.,* 706 F.Supp. 952, 953–54, 957 (D.Me.1988).

summary judgment for the plaintiff on this claim. In *Reiter* the Supreme Court allowed a claim for recoupment against a claim for damages brought by a shipper against a carrier to be maintained as a counterclaim although it had been improperly pled as an affirmative defense and held that "recoupment claims are generally not barred by a statute of limitations so long as the main action is timely." 507 U.S. at 264, 113 S.Ct. 1213. In *Ramsdell,* the Law Court allowed a borrower against whom a bank sought foreclosure of a mortgage to amend her answer to include as an affirmative defense a federal statutory creditors' rights claim upon which the federal court had earlier granted summary judgment to the defendant based on the expiration of the applicable statute of limitations. 689 A.2d at 599. Neither opinion suggests that summary judgment should not be entered on a time-barred claim merely because it might also be brought as an affirmative defense. In addition, it is not at all clear that this claim is one for recoupment, since the plaintiff does not seek to recover under the 1995 Agreement in any of the claims in the amended complaint. Black's Law Dictionary, in its definition of "recoupment," states that "[i] implies that plaintiff has cause of action, but asserts that defendant has counter cause of action growing out of breach of some other part of same contract on which plaintiff's action is founded, or for some cause connected with contract." *Black's Law Dictionary* 1275 (6th ed.1990). I see no connection here between the plaintiff's claims and the defendants' claim that the 1995 Agreement violated New York franchise law.

The plaintiff is entitled to summary judgment on Count IV of the counterclaim.

### G. Defendants' Motion to Strike

The defendants have moved to strike portions of the plaintiff's Opposing Statement of Material Facts on the ground that those entries are based on the expert testimony or opinion of a witness who was never designated as such. Defen-dants/Counterclaim Plaintiffs' Motion to Strike Portions of Plaintiff/Counterclaim Defendant's Opposing Statement of Material facts and Deposition Testimony of George A. Markell, Jr. (Docket No. 40). Because I do not rely on any of the information so identified by the defendants in reaching my conclusions set forth above on the motions for summary judgment, this motion is moot.

### V. Conclusion

For the foregoing reasons, I grant the plaintiff's motion to strike (Docket No. 43), recommend that the plaintiff's motion for partial summary judgment be **GRANTED** as to Count I of the amended complaint and as to Counts I–IV and VII–VIII of the counterclaim and otherwise **DENIED**, and recommend that the defendant's motion for partial summary judgment be **GRANTED** as to Count III of the amended complaint and otherwise **DENIED**. The defendants' motion to strike (Docket No. 40) is moot.

Oct. 1, 1999.